UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 9/30/19

ANGELIQUE OLAECHEA,

    Plaintiff,

    v.

THE CITY OF NEW YORK, LIEUTENANT
DANIEL BROWN, AND CAPTAIN
VINCENT GREANY,

    Defendants.

No. 17-CV-4797 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff Angelique Olaechea commenced this action against Defendants Lieutenant Daniel Brown, Captain Vincent Greany, and the City of New York ("Defendants"), asserting various employment discrimination claims, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e *et seq.*; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296; and the New York City Human Rights Law ("NYCHRL"), N.Y. City Admin. Code § 8-101 *et seq.* Before the Court is Defendants' motion for summary judgment. For the following reasons, the motion is granted, except as to Olaechea's retaliation claims against the City, and her retaliation claim against Defendant Greany under the NYSHRL and the NYCHRL.

## I. Factual Background

The following facts, construed in the light most favorable to Olaechea, are undisputed unless otherwise noted. *See Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011).

### A. Olaechea's Time at the 9th Precinct

Olaechea began working as a police officer for the City of New York on June 30, 1995, and was promoted to Lieutenant in 2008. As relevant here, between then and September 2016, Olaechea was assigned to the 9th Precinct in the Lower East Side of Manhattan, where she served as a platoon commander. Defendant Captain Vincent Greany, the 9th Precinct's Commanding Officer since June 15, 2016, oversaw all precinct operations, and was Olaechea's supervisor. Olaechea in turn supervised Police Officer Javier Velazquez. *Id.* ¶ 10. Defendant Lieutenant Daniel Brown also worked at the 9th Precinct as its Administrative Lieutenant.

#### 1. The July 10, 2015 Note, the "Fraternization" Investigation, and the 911 Call

On July 10, 2015, Velazquez informed Olaechea about a note "that was passed to him . . . on the telephone switchboard"—an area in the precinct where officers would often post messages for one another—which stated: "Officer Velazquez, stop fucking the Lieutenant." Pl's Rule 56 Stmt. 24 ¶ 1.[2] Olaechea understood the lieutenant mentioned in the note to be referring

---

[1] These facts are drawn from the parties' Rule 56.1 Statements and their submissions in connection with Defendants' summary judgment motion. Where facts in a party's Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied only by way of a conclusory statement by the other party, without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true. *See* S.D.N.Y. Local Rules 56.1(c)–(d).

[2] Defendants object to the contents of the note, but they do not cite any evidence to the contrary. *See* Defs.' Resp. to Pl.'s Rule 56 ¶ 74 (admitting only that Velazquez informed Olaechea of "some note that was passed to him . . . on July 10, 2015"). Olaechea also testified that the note was written "during the times that [she] was helping Officer Velazquez with his discrimination complaints." Olaechea Dep. Tr. at 53:20–21. But as noted further below, those discrimination complaints were made a few months after she claims the note was written in her Rule 56 Statement.

to her. *See* Olaechea Dep. Tr. at 52:12–14, Murrell Decl., Ex. A (Dkt. 38-1). She reported the incident to Deputy Inspector Peter Venice.

Defendants assert that on September 18, 2015, Venice filed a report with the Office of Equal Employment Opportunity ("OEEO") "stating that while conducting an investigation into whether plaintiff and Velazquez had a relationship, Velazquez' wife confirmed that plaintiff and Velazquez were involved in an extramarital affair." Defs.' Rule 56 Stmt. ¶ 11. In support of that statement, Defendants submit an August 20, 2015 email sent from Velazquez' wife to Venice, expressing her "concerns" that "Olaechea and [her] husband are having an extramarital affair," which she believed was "going on since March/April 2015." Murrell Decl., Ex. J at 2. Defendants also submitted an OEEO report which memorializes that Venice phoned the OEEO to inform them that he was "conducting an investigation" into Olaechea and Velazquez's relationship, and that he received "an email from Velazquez's wife confirming that the two were involved in an affair." Defs.' Answer, Ex. A at 1 (Dkt. 16-1) (cited at Defs.' Rule 56 Stmt. ¶ 11).[3]

A little over one month later, on October 26, 2015, Olaechea filed her first complaint with the OEEO in support of Velazquez, describing certain incidents in which he was purportedly mistreated by his superiors in the 9th Precinct. *See* Murrell Decl. Ex. E.

On November 17, 2015, Olaechea appeared before the NYPD's Department Advocate's Office to answer questions pertaining to the July 10, 2015 note that she reported to Venice.[4] She asserts that three officers questioned her at the meeting, one of whom stated that Olaechea was

---

[3] Olaechea objects to the contention that Venice made any report to the OEEO concerning her and Velazquez's relationship, asserting that Defendants cited only the email from Velazquez' wife as evidence in support of that statement. *See* Pl's Rule 56 ¶ 11. Defendants did indeed cite the report, however, *see* Defs.' Rule 56 Stmt. ¶11, and they further included it in the record. *See* Defs.' Answer, Ex. A at 1 (Dkt. 16-1).

[4] Olaechea states that this meeting occurred on "on or about November 5, 2015." *See* Defs. Resp. to Pl's Rule 56 ¶ 77. Defendants respond that it occurred on November 17, 2015, which is reflected in the transcript of the meeting that Plaintiff submitted in opposing Defendants' motion. *See* Nwokoro Decl., Ex. 9 (Dkt. 43-9).

3

"present as a subject," noting that there were allegations against her that she "'fraternize[d]' with [a] subordinate." Nov. 15, 2015 Hr'g Tr. at 4:6–8, Nwokoro Decl., Ex. 9 (Dkt. 43-9). Defendants admit that fraternizing with a subordinate is not a violation of NYPD rules, provided that the relationship does not become "prejudicial to good order, efficiency or discipline" within the NYPD. Pl.'s Rule 56 Stmt. 25 ¶ 5. At the November 17th meeting, Olaechea was asked whether she ever had an "intimate relationship" with Velazquez, and whether she ever went "on a romantic date" or "engage[d] in sexual activity" with Velazquez while she was on duty. Nov. 15, 2015 Hr'g Tr. at 7:15–22.

On December 23, 2015, Olaechea wrote her second complaint to the OEEO on behalf of Velazquez. This time she reported, among other things, that Defendant Brown had made a false allegation that Velazquez had threatened him, and that Velazquez was being retaliated against for having made his own complaints to the OEEO. *See* Murrell Decl. Ex. F.

Approximately two weeks later, on January 5, 2016, Olaechea called 911 from her home, requesting assistance in resolving a domestic dispute with her daughter. The Suffolk County Police Department responded, and Olaechea informed one of the officers that her daughter did not like it when guests were present in the house, including, for example, Velazquez, who was there at the time. The officer prepared a so-called Domestic Incident Report. The second page of the report includes a statement that Olaechea's daughter "got very upset because she does not like [Olaechea's] boyfriend Javier [Velazquez]." Defs.' Rule 56 Stmt. ¶ 19. Olaechea does not dispute that she signed the statement. But she claims that the Suffolk County officer who wrote it simply assumed that Velazquez was her boyfriend, and that she never told him that was the case.

## 2. Additional Complaints on Behalf of Velazquez and the Administrative Transfer

On August 10, 2016, Olaechea wrote a third complaint on behalf of Velazquez to the OEEO. This complaint alleged that Velazquez was being subjected to a hostile work environment by his supervisors, including Defendant Brown, and further described incidents in which Velazquez was allegedly discriminated against.

Three weeks later, on September 8, 2016, Greany submitted a request to the Chief of Manhattan South that Olaechea be administratively transferred from the 9th Precinct. In the request, Greany wrote, among other things, that Olaechea had engaged in a "pattern of unacceptable behavior" including "showing favoritism" toward Velazquez, "by changing his tour and assignments numerous times," and "blatantly disregard[ing]" a subsequent direction from Greany that she cease doing so. Defs.' Answer, Ex. B at 2 (Dkt. 16-4) (cited at Defs.' Rule 56 Stmt. ¶ 11). Greany further asserted that it was "evident [Olaechea] has a relationship with Velazquez that goes beyond the conventional supervisor to subordinate relationship." Defs. Rule 56 Stmt. ¶ 27.

Less than one week later, on September 14, 2016, Olaechea testified on Velazquez's behalf at his disciplinary trial (which concerned conduct not relevant here) that he was discriminated against and subjected to a hostile work environment because he is Latino. Just over two weeks after that, on September 29, 2016, Olaechea was placed on "Level I Disciplinary/Performance Monitoring" ("Level I Monitoring"). Defs.' Rule 56 Stmt. ¶ 29. Level I Monitoring is the NYPD's "least intrusive" monitoring program, intended to "augment the Commanding Officer's ability to correct negative behavior." Defs.' Answer, Ex. D (Dkt. 16-4). Defendants contend that Olaechea was placed on Level I Monitoring because of the negative behavior described in Greany's request to the Chief that she be administratively transferred.

Olaechea responds that it was because Defendants were retaliating against her for testifying that Velazquez had been discriminated against at his departmental hearing.

The Chief granted Greany's transfer request and, the day after Olaechea was placed on Level I Monitoring, she was administratively transferred from the 9th Precinct to the 79th Precinct.

## B. Olaechea's Time at the 79th Precinct

According to Olaechea, when she arrived at the 79th Precinct, she was placed "on the four to twelve shift for the first month," and for the following three months she was placed "on the day tour." Pl.'s Rule 56 Stmt. ¶ 36. She claims that as a result of the transfer, and being placed on the day tour, her salary was reduced "by approximately $900 per month because she lost the night differential." *Id.* The night differential refers to the fact that NYPD officers earn 10% more money per hour when they work during the hours between 4:00 p.m. and 8:00 a.m. At the same time, Olaechea also complains that after she "settled into the day shift, she was unceremoniously transferred to midnight[] shift against her wishes when it was a hardship for her and she had specifically requested to stay on the day shift." *Id.*

One week after Olaechea had started at the 79th Precinct, on October 8, 2016, she filed a complaint of employment discrimination with the NYPD OEEO, alleging that Greany and Brown (the administrative Lieutenant from the 9th Precinct) had transferred her to the 79th Precinct, placed her on Level I Monitoring, and lodged false allegations against her "in retaliation for helping Velazquez." Defs.' Rule 56 Stmt. ¶ 39.

### 1. The Locker Incident

That same week, an incident occurred with respect to Olaechea's retrieval of her belongings from her locker at the 9th Precinct, the facts of which are mostly disputed. According

to Defendants, on October 11, 2016, Olaechea was directed to report to the 9th Precinct to clean out her locker and remove her items by October 14th. At an unspecified time between those two dates, Defendants contend that Brown, while accompanied by a female officer, Jessica Torres, clipped the lock on an unlabeled locker because lockers were needed for incoming officers. Upon discovering that the items inside the purportedly unlabeled locker belonged to Olaechea, Defendants allege that Brown placed the belongings into a sealed bag that Torres retrieved on Olaechea's behalf prior to October 14th. According to Olaechea, however, after Brown notified her by phone on October 11th that she had until October 14th to remove any items from her locker, she arranged for Officer Torres to retrieve her items that day. Contrary to Defendants' assertion, Olaechea that there was no shortage of lockers in the female locker room. She further claims that: (1) Officer Torres was not accompanying Brown when he clipped the locker at issue; (2) when Officer Torres visited the locker room, a locker labeled as Olaechea's—not an unlabeled one—had already been "broken into,"; and (3) Brown put Olaechea's belongings into a garbage bag that he kept, only returning the bag to Torres after Olaechea allegedly complained about Brown's conduct to her Union Delegate. The parties nonetheless do not dispute that none of Olaechea's items were damaged.

On October 31, 2016, the OEEO informed Olaechea that the investigation into her complaint against Greany and Brown that she had filed earlier that month was complete, and that it did not reveal evidence of retaliation under Title VII, or related state and local laws.

### 2. Charges Brought Against Olaechea and Her Disciplinary Trial

On November 2, 2016, NYPD Deputy Chief James N. McCarthy initiated (or, as New York state law puts it, "preferred") charges against Olaechea in two disciplinary cases for her

alleged misconduct. The charges in the first case, which were amended on May 12, 2017, alleged

that Olaechea:

1. "on or about June 26, 2016, having performed an overtime tour, wrongfully failed to sign the Return Roll Call upon end[ing] the tour early and wrongfully failed to submit an Overtime Report in a timely manner";

2. "between June 25, 2016 and June 26, 2016, wrongfully granted an Emergency Day to a Member of the Service when she was not the on-duty 9th Precinct Desk Officer and failed to ensure that the Roll Call was adjusted and that a Leave of Absence Report was submitted";

3. "between August 1, 2016 and August 7, 2016, after having been directed by Captain Vincent Greany not to make changes to Roll Calls for Members of the Service not assigned to her Platoon, wrongfully failed to comply with said direction/order";

4. "on or about August 9, 2016, while acting as the Desk Officer, and after having been directed by Captain Vincent Greany to promptly review and approve Complaint Reports, wrongfully failed to comply with said direction/order";

5. "between February 21, 2014 and October 1, 2016, engaged in conduct[] prejudicial to the good order, efficiency, or discipline of the Department, to wit: [Olaechea] wrongfully showed preferential treatment or favoritism towards a Member of the Service, Police Officer Javier Velazquez."

Defs.' Rule 56 Stmt. ¶ 59. The charges in the second case alleged that Olaechea:

1. "on or about November 19, 2015, in Suffolk County, New York, after having been involved in an unusual police occurrence or off-duty incident, wrongfully failed to notify the Operations United, as required";

2. "on or about January 15, 2016, in Suffolk County, New York, after having been involved in an unusual police occurrence or off-duty incident, wrongfully failed to modify the Operations Unit as required."

*Id.* ¶ 58.

A disciplinary trial was held with respect to all of the above charges on July 27, August

2, September 8, October 5, October 6, and November 8, 2017. Olaechea pled not guilty to every

charge. Two of Olaechea's children were subpoenaed by the NYPD to testify at the trial on July

27. *See* Nwokoro Decl., Exs. 10, 11. On February 5, 2018, Assistant Deputy Commissioner of Trials Paul M. Gamble ("ADCT Gamble"), who presided over the trial, issued a report finding Olaechea guilty of all charges, except for the fourth charge for which he found her not guilty. The report included a recommendation to the NYPD Commissioner that Olaechea be dismissed from the NYPD, but that her dismissal be held in abeyance for a one-year period, during which time she would remain at the NYPD at the Commissioner's discretion where she could be terminated without further notice. *See* N.Y.C. Admin Code § 14-115(d). ADCT Gamble also recommended that Olaechea be required to forfeit 30 vacation days. On March 29, 2018, the NYPD Commissioner approved ADCT Gamble's recommendation. Olaechea alleges that although she was reluctant to retire before the termination took effect, she did so on June 2018 so that she could keep her pension.

**II. Procedural Background**

Olaechea received her notice of right to sue from the Equal Employment Opportunity Commission ("EEOC") on May 12, 2017. She filed the Complaint in this action on June 25, 2017, asserting claims for unspecified discrimination, hostile work environment, and retaliation, pursuant to Title VII, the NYHSRL, and the NYCHRL, which Defendants answered. After the parties completed discovery, Defendants filed the instant motion for summary judgment.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 56 authorizes a court to grant summary judgment if the movant establishes that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). A fact is "material" if it "might affect the outcome of the suit under the governing law," and it is "genuinely in dispute" if "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *Id.* (citations omitted). In deciding such a motion, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod*, 653 F.3d at 164 (citation omitted).

The moving party has the initial burden of demonstrating that no genuine issue of material fact exists. *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). If it satisfies this burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (citation and alteration omitted).

## DISCUSSION

### I. Individual Liability under Title VII

As a threshold matter, "individuals are not subject to liability under Title VII." *Sassaman v. Gamache*, 566 F.3d 307, 315–16 (2d Cir. 2009). Olaechea's Title VII claims as against the individual defendants are, therefore, dismissed.

### II. Discrimination Claims

Defendants are entitled to summary judgment on Olaechea's discrimination claims because she failed to adequately plead them in her Complaint. The Complaint asserts three causes of action for "discrimination" under Title VII, the NYSHRL, and the NYCHRL. In support of those claims, Olaechea alleges that Defendants "discriminated against [her] because

she testified in a department hearing about the racial discrimination suffered by Officer Velazquez." Compl. ¶¶ 38, 40, 42. Nowhere does the Complaint allege that Defendants ever discriminated against her because she is Latina. Yet in her opposition to Defendants' summary judgment motion, Olaechea—for the first time—asserts that she is making "one central claim of racial discrimination," namely, that "[b]ecause she is a Latina female, she was not offered any of the multiple administrative positions available to Lieutenants in the 9th Precinct," which purportedly went to white males. Pl.'s Mem. Opp. at 11. But "[i]t is black letter law that a party may not raise new claims," *Brandon v. City of N.Y.*, 705 F.Supp. 2d 261, 278 (S.D.N.Y. 2010), nor "completely new theories of liability asserted for the first time in opposition to summary judgment," *Casseus v. Verizon N.Y., Inc.*, 722 F. Supp. 2d 326, 344 (E.D.N.Y. 2010).[5] Because Olaechea failed to previously assert against Defendants any racial discrimination claims, or gender discrimination claims independent of her hostile work environment claims, including a failure to promote claim, those claims are dismissed.

## II. Hostile Work Environment Claims

Defendants are entitled to summary judgment on Olaechea's hostile work environment claims.

### A. Title VII Claim Against the City and NYSHRL Claim Against All Defendants

To prevail on a hostile work environment claim under Title VII and the NYSHRL, Olaechea "must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's

---

[5] In her causes of action for a hostile work environment, as alleged in the Complaint, Olaechea asserted that "[t]he Defendants discriminated against [her] on the basis of her gender, by falsely accusing her of personal involvement with a male police officer thereby creating a hostile work environment[.]" Compl. ¶¶ 50, 52, 54. The Complaint does not separately allege a cause of action for gender discrimination apart from the hostile work environment claims, nor does it mention anything about Defendants failing to promote her based on either her race or gender.

employment and create an abusive working environment." *Littlejohn v. City of New York*, 795 F.3d 297, 320–21 (2d Cir. 2015). These elements have objective and subjective components: "the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Id.* at 321 (citation omitted). In addition, the plaintiff "must show that the hostile conduct occurred because of a protected characteristic." *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015).

As previously noted, Olaechea's hostile work environment claim is predicated on the individual Defendants having allegedly discriminated against her because of her gender. She asserts that such discrimination occurred from the date she filed the first OEEO complaint on behalf of Velazquez, on October 21, 2015, until she was transferred from the 9th Precinct, on September 29, 2016. *See* Pl's Mem. Opp. at 14. The grounds for her hostile work environment claim arise from the NYPD's investigation into her relationship with Velazquez. Olaechea contends that the "humiliating" investigation created a hostile work environment because: (1) Brown and Greany told her co-workers that she was romantically involved with Velazquez; (2) she was "accused and tried for having sexual relations with Velazquez," *id.*; (3) her subordinates and one of her children were subpoenaed to testify at Olaechea's disciplinary trial; and (4) she was required to undergo an investigative interview during which male supervisors inquired as to whether she was having sexual relations with Velazquez.[6] Olaechea fails to establish, however, that a reasonable jury could conclude that these incidents collectively amount to a gender-based hostile work environment.

---

[6] In her opposition brief, Olaechea asserts that she "underwent two official investigative [i]nterviews[.]" Pl's Mem. Opp. at 15. But the exhibit she cites in support of that statement includes a transcript of only one investigative interview on November 15, 2015. Her Rule 56 Statement also refers to only one investigative interview. *See* Pl.'s Rule 56 Stmt. at 24 ¶ 4.

First, the alleged rumors that were spread about Olaechea being romantically involved with Velazquez do not support the existence of a hostile work environment based on Olaechea's *gender*. Rumors of two colleagues having a sexual relationship with one another are not innately gender based—they may be equally upsetting to either colleague regardless of their gender. Even assuming that any of the purported rumors could be deemed gender specific, Olaechea has produced no evidence that they were motivated by gender animus in particular. *See Brown v. Henderson*, 257 F.3d 246, 256 (2d Cir. 2001) (affirming summary judgment for defendant where the evidence established that "the hostility toward [the plaintiff] was grounded in workplace dynamics unrelated to her sex"). Indeed, courts in this district have routinely held that "comments by coworkers about an extramarital affair do not inherently constitute conduct motivated by gender animus." *Brant v. Cty. of Dutchess*, No. 05-CV-10590 (KMK), 2008 WL 418379, at *5–6 (S.D.N.Y. Feb. 11, 2008) (citing cases). Similarly, Defendants' decision to subpoena Olaechea's children to testify at her departmental trial—despite whether or not it was intended to harass her—does not suggest on its face that it was motivated by her gender.

It is true that during the investigative interview conducted in November 2015—which addressed, in part, the July 10, 2015 note that allegedly referenced a sexual relationship between Velazquez and Olaechea—she was asked whether she had engaged in sexual conduct with Velazquez while on duty. Unlike the other allegations of hostile work environment just discussed, the record may suggest that the investigative interview was gender-based. This is because Defendants have not rebutted Olaechea's assertion that Velazquez's relationships with other male employees—who also complained that Velazquez was being discriminated against—

were not investigated.[7] But even if the questions Olaechea was asked at the November 2015 interview may have been motivated at least in part by her gender, and even though they may have been embarrassing or degrading, they fall short of establishing a hostile work environment claim. *See Lioi v. New York City Dep't of Health & Mental Hygeine*, 914 F. Supp. 2d 567, 590 (S.D.N.Y. 2012) (citing cases dismissing hostile work environment claims based on more severe conduct including, for example, multiple requests for dates, sexual comments, and instances of unwanted touching).

Although Olaechea asserts that she was "tried for having sexual relations with Velazquez," Pl.'s Mem. Opp. at 14, the record does not suggest that the trial itself amounted to objectively harassing conduct. Olaechea points to no place in the trial transcript (and the Court has not independently found one) where she was even asked about whether her relationship with Velazquez was sexual in nature. To the contrary, her departmental trial was focused exclusively on whether she had committed the conduct identified in the charges leveled against her.

In short, there are no triable issues of fact as to whether the investigation into Olaechea's relationship with Velazquez, and the related rumors, constituted a severe or pervasive form of sex-based harassment. Olaechea's hostile work environment claims under Title VII and the NYSHRL are, accordingly, dismissed.

**B. NYCHRL Claim Against All Defendants**

The NYCHRL, by contrast, imposes broader liability for hostile work environment claims than Title VII and the NYSHRL. *See Mihalik v. Credit Agricole Cheuvreux North Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013). Under the NYCHRL, "the federal severe or pervasive standard" does not apply. *Id.* Instead, a plaintiff need only show that she was treated "less well . .

---

[7] It is true, however, that Olaechea is the only officer who is alleged to have demonstrated favoritism towards Velazquez.

. because of a discriminatory intent" and that the conduct rose above a "petty slight[] and trivial inconvenience[]." *Id.* at 110-11. Nevertheless, "the NYCHRL, like Title VII and the NYSHRL, is still not a general civility code, and petty slights and trivial inconveniences are not actionable." *Davis–Bell v. Colum. Univ.*, 851 F.Supp. 2d 650, 671 (S.D.N.Y. 2012). And a plaintiff must still establish that the hostile work environment was based on a protected class. *See, e.g., Margherita v. FedEx Express,* 511 Fed. App'x 71, 72–73 (2d Cir. 2013).

Even under the NYCHRL, a reasonable jury could not find that Defendants subjected Olaechea to a gender-based hostile work environment. As noted above, nothing in the record suggests that any rumors about her relationship with Velazquez were motivated by a gender-based animus. The same may not be true as to the Defendants' decision to investigate the relationship because, as noted, male employees who complained that Velazquez was being discriminated against were not similarly investigated. But the fact that Olaechea, who was accused of providing preferential treatment to Velazquez, was asked whether she had ever engaged in sexual conduct with Velazquez while on duty during the November 15 investigative interview, does not rise beyond the level of a petty slight or trivial inconvenience. *Cf. Nieblas-Love v. N.Y.C. Hous. Auth.*, 165 F. Supp. 3d 51, 68 (S.D.N.Y. 2016) (evidence that plaintiff's co-worker used "racial slurs during heated arguments" was insufficient to survive summary judgment as to the plaintiff's NYCHRL hostile work environment claim); *Magnoni v. Smith & Laquercia, LLP*, 701 F. Supp. 2d 497, 505–506 (S.D.N.Y. 2010) (allegations that supervisor told "a crude anecdote from his sex life with another woman, and occasionally referr[ed] to [the plaintiff] as voluptuous and knock[ed] her knee" deemed insufficient to state a claim for hostile work environment under the NYSHRL). Defendants are thus entitled to summary judgment on Olaechea's hostile work environment claims brought under the NYCHRL.

**III. Retaliation**

Defendants are not, however, entitled to summary judgment on most of Olaechea's retaliation claims.

**A. Title VII Claim Against the City[8]**

Retaliation claims brought under Title VII are governed by the framework set forth in *McDonald-Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013). Pursuant to that framework, in order to establish a *prima facie* case of retaliation in response to a motion for summary judgment, a plaintiff must submit sufficient admissible evidence to allow a trier of fact to find that: "(1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P. C.*, 716 F.3d 10, 14 (2d Cir.2013) (per curiam). "Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action." *Summa*, 708 F.3d at 125. If the employer can do so, then the burden shifts back to the plaintiff to show that retaliation was a "but-for" cause of the adverse action, not simply a "substantial" or "motivating" factor in the employer's decision. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 348-49 (2013). "'But-for' causation does not, however, require proof that retaliation was the only cause of the employer's action—it is enough that the adverse action would not have occurred in the absence of the retaliatory motive." *Nieblas-Love*, 165 F. Supp. 3d at 70 (quoting *Nassar*, 570 U.S. at 360-61).

**1. Olaechea's *Prima Facie* Case**

---

[8] As previously noted, Title VII does not provide for individual liability. Olaechea's Title VII retaliation claim as against the individual Defendants is thus dismissed.

Olaechea has met her burden of demonstrating that a reasonable jury could find that she has established a *prima facie* case of retaliation.

### a. Defendants' Awareness of Olaechea's Protected Activity

It is undisputed that Olaechea wrote three complaints to the internal EOO, on behalf of Velazquez, that she further testified as to that discrimination at his departmental hearing, and that she filed an OEEO complaint on her own behalf on October 8, 2016. This conduct constitutes protected activity for the purposes of her federal and state retaliation claims. *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) (finding plaintiff established a *prima facie* case of retaliation based on complaints made to defendant employer that a colleague was racially discriminated against); *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 175-76 (2d Cir. 2005) (holding that being "poised to testify in support of a co-worker's discrimination claims" constitutes protected activity under Title VII). It is also not disputed that Defendants were aware of Olaechea's complaints and testimony regarding the discrimination Velazquez allegedly experienced. The first two elements of Olaechea's *prima facie* case are thus easily satisfied.

### b. Materially Adverse Actions

To establish a materially adverse action, a plaintiff must show that the action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006)). Olaechea argues that she suffered materially adverse actions when she became the subject of an investigation concerning her relationship with Velazquez, allegedly motivated by retaliatory intent. She contends that the investigation led her to experience further material adverse actions, namely, that she was: (1)

placed on Level I performance monitoring on September 29, 2016; (2) transferred to the 79th Precinct on September 30, 2016; (3) tried on charges brought against her on November 2, 2016; (4) negatively evaluated in December 2016; and (5) placed on dismissal probation and ordered to forfeit 30 vacation days on March 29, 2018. In response, Defendants acknowledge that the penalties imposed on Olaechea after the departmental trial constitute a materially adverse action. *See* Defs.' Mem. at 6. They nonetheless argue that the other four events do not. Except for the negative employment evaluation, the Court disagrees.

In arguing that only Olaechea's post-departmental trial penalties are adverse actions, the City overlooks that the "adverse employment action" standard in the context of a Title VII retaliation claim "covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015). Unlike in the discrimination cases that Defendants cite, in a retaliation case, an adverse action "is not limited to discriminatory actions that affect the terms and conditions of employment." *Id.* (quoting *White*, 548 U.S. at 64). Rather, the *sine qua non* of material adversity is whether "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 25 (2d Cir. 2012) (quoting *White*, 548 U.S. at 68).

Defendants' decision to investigate Olaechea's conduct and to bring charges against her may also constitute an adverse employment action for retaliation purposes. Some courts in this Circuit "have disagreed as to whether an investigation into disciplinary charges that does not result in any discipline may be sufficient [to] constitute an adverse action in the retaliation context." *Burgos v. City of New York*, No. 18-CV-1150 (JPO), 2019 WL 1299461, at *8 (S.D.N.Y. Mar. 21, 2019) (citing cases). Here, however, the investigation and the charges

18

indisputably led to Olaechea being disciplined: she was ultimately placed on dismissal probation and required to forfeit thirty vacation days as a result. A reasonable juror could very well conclude that this investigation and the resulting charges would dissuade a reasonable employee from making discrimination complaints. *See Campbell v. N.Y.C. Transit Auth.*, 93 F. Supp. 3d 148, 177 n.30 (E.D.N.Y. 2015); *Monclova v. City of New York*, No. 05-CV-3164, 2008 WL 822117, at *7 (E.D.N.Y. Mar. 26, 2008) (disciplinary charges may constitute an adverse action for purposes of a retaliation claim).

A reasonable juror could also conclude that Olaechea's placement on Level I Monitoring and administrative transfer to the 79th Precinct were materially adverse actions. As the NYPD's performance monitoring manual recognizes, and as Olaechea and Sergeant Khazin attest, placement on Level I Monitoring is a form of discipline. *See* Answer, Dkt. 16-6; Olaechea Decl. ¶ 12; Khasin Decl. ¶ 12 (explaining that "[m]embers of service placed on performance monitoring are denied certain benefits"). ADCT Gamble made clear that his ultimate penalty recommendation was based on consideration of Olaechea's prior disciplinary measures—which specifically included her placement on Level I Monitoring. *See* Murrell Decl. Ex. B at 34 (Dkt. 54-1). Where a disciplinary measure contributes to specific penalties, the factfinder could reasonably conclude that the discipline was materially adverse. *See White v. Dep't of Corr. Servs.*, 814 F. Supp. 2d 374, 388–389 (S.D.N.Y. Sept. 30, 2011) (finding that a reasonable jury could determine that a notice of discipline was materially adverse where it contributed to the plaintiff paying a fine to settle a disciplinary action). With respect to Olaechea's administrative transfer to the 79th Precinct, she testified that it resulted in a significant loss of overtime wages. *See* Olaechea Dep. Tr. at 32:2–15. Courts have found that the lost opportunity to earn overtime can constitute a materially adverse action. *See Rosario v. N.Y.C. Dep't of Homeless Servs.*, No.

06 Civ. 7197 (PAC) (GWG), 2008 WL 449675, at *6 (S.D.N.Y. Feb. 19, 2008) (citing cases); *see also Grana v.Potter*, Nos. 06-CV-1173, 07-CV-0476, 2009 WL 425913, at *7 (E.D.N.Y. Feb. 19, 2009). Although Olaechea does not substantiate that testimony with payment records, Defendants have not pointed to any evidence to the contrary. Nor have they rebutted Olaechea's assertion that the 79th Precinct is "where people get transferred as part of a punishment." Olaechea Dep. Tr. at 26:23:27–9 (asserting that "a senior officer with almost 23 years on the job, with a clean disciplinary record, doesn't just get thrown from the 9th Precinct," in the Lower East Side of Manhattan, "where the only crimes . . . are noise complaints . . . [to] the 79th Precinct, in Brooklyn, where all you have [are] homicides [and] robberies"). Drawing all reasonable inferences in her favor, a factfinder could reasonably conclude that an administrative transfer from the 9th to 79th Precinct could deter an employee from making a discrimination complaint.

By contrast, Olaechea has not established that a triable issue of fact exists as to whether the negative performance evaluation that she received in December 2016 (in which she was given a 2.5 rating) was materially adverse. Courts have often ruled that a negative employment evaluation "absent concrete negative consequences to the employee . . . is not sufficient to support a retaliation claim." *Dawson v. City of New York*, No. 09 Civ.. 5348 (PGG), 2013 WL 4504620, at *15–18 (S.D.N.Y. Aug. 19, 2013) (citing cases granting summary judgment on employer retaliation claims where plaintiffs failed to establish "any negative consequences" resulting from negative performance evaluations). ADCT Gamble's ultimate penalty recommendation to the Commissioner did not rely on Olaechea's December 2016 evaluation. *See* Defs. Amended Ex. B at 34. Because Olaechea has not identified any other concrete negative consequences that she faced as a result of that evaluation, it does not constitute a materially adverse action.

In summary, the allegedly retaliatory investigation into Olaechea's relationship with Velazquez, followed by her placement on Level I Monitoring, the administrative transfer, the initiation of charges, and the imposition of penalties against her, may constitute material adverse actions.

### c. Causal Connection

Olaechea has further adequately established that these adverse actions were causally connected to her protected activity. A plaintiff may establish the requisite causal connection either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).

First, Defendants do not respond to Olaechea's testimony that during the period in which she made the complaints about Velazquez—that is, at some unspecified point between October 2015 and August 2016—Venice and Defendant Brown screamed at her, asking why she was "looking out for Velazquez." Olaechea Decl. ¶ 47. Such "evidence of an employer's anger at its employee for engaging in a protected activity may well constitute direct causal evidence" of retaliation. *Delville v. Firmenich Inc.*, 920 F. Supp. 2d 446, 466 (S.D.N.Y. 2013) (finding evidence that the plaintiff's "superiors were angry at him for complaining about age discrimination" was direct evidence of a causal connection between plaintiff's protected activity and defendant's alleged retaliation in violation of Title VII).

The record also reveals that there is a close temporal proximity between Olaechea's protected conduct, the investigation, and the events that followed, which supports the existence

of a causal connection. *See Kaytor v. Elec. Boat Corp.,* 609 F.3d 537, 552 (2d Cir. 2010) (noting that "[c]lose temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection between a protected activity and retaliatory action."). It is true that the July 10, 2015 incident involving the note that allegedly referenced a sexual relationship between Velazquez and Olaechea—and which provided at least one purported reason for Defendants to investigate— occurred prior to Olaechea's first complaint on behalf of Velazquez, on October 26, 2015. She was not ultimately interviewed by three officers, however, until about three weeks *after* she made her first complaint, on November 17, 2015.

In addition, Greany submitted the September 8, 2016 letter—which requested that Olaechea be placed on performance monitoring and administratively transferred—roughly three weeks after she made her third complaint on behalf of Velazquez on August 10, 2016. Those requests were granted on September 29 and 30, 2016—mere days after she testified on Velazquez's behalf on September 14, 2016. And the decision to initiate charges on November 2, 2016, occurred within less than three months of that testimony, and less than one month after she filed her own complaint with the OEEO on October 8, 2016, alleging that she was being retaliated against. This temporal proximity suffices to establish a causal connection between Olaechea's protected activity and the adverse actions for the purposes of her *prima facie* case. *See Gorzynski,* 596 F.3d at 100 (explaining that while the Second Circuit has "not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation," it has previously "held that five months is not too long to find the causal relationship"); *cf. Murray v. Visiting Nurse Servs. of N.Y.,* 528 F.

Supp. 2d 257, 275 (S.D.N.Y. 2007) (citing cases finding that two months is the "dividing line" between a permissible and impermissible inference of causation in this Circuit).

It is true that the actual penalties imposed on Olaechea after her departmental trial were the result of ADCT Gamble finding her guilty of the charges based on the evidence before him. But that does not foreclose a finding that to the extent Defendants brought the charges for retaliatory purposes, such retaliation was also causally connected to the ultimate penalties imposed—dismissal probation and the forfeiture of 30 vacation days. *See Leon v. New York City Dept. of Educ.*, 612 Fed. App'x 632, 634–635 (2d Cir. 2015) (holding that a hearing officer's determination that "there was cause" for plaintiff's termination did not preclude the plaintiff from making a *prima facie* case of retaliation, where the hearing officer never addressed whether the underlying charges were driven by retaliatory intent); *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 47 (2d Cir. 2014) (affirming conclusion that "the hearing officer's determination" that the plaintiff "had engaged in the charged conduct, and these violations called for his termination" did not preclude a jury from later finding that the plaintiff "was also terminated at least in part" because of a discriminatory or retaliatory animus). Indeed, ADCT Gamble imposed the very penalties recommended by Defendants. Thus, because the initiation of charges may have been caused by retaliatory animus, and those charges ultimately led to the imposition of serious penalties against Olaechea, the penalties may too be viewed as the result of retaliation— even if they were also the result of Olaechea having committed the charged conduct. Olaechea has therefore established a *prima facie* case of retaliation based on the adverse actions at issue.

## 2. The City's Proffered Non-Retaliatory Justifications

Defendants have met their burden of proffering legitimate, non-retaliatory reasons for the adverse actions at issue. Defendant Greany asserted in his sworn affidavit that the decision to

place Olaechea on Level I Monitoring and to subsequently transfer her to the 79th Precinct was based on the information included in his September 8, 2016 request to the Chief of Manhattan South. As previously noted, that request identified a purported "pattern of unacceptable behavior" on the part of Olaechea—namely, that she had on multiple occasions allegedly adjusted Velazquez's tour dates, including granting him days off, even though he was not assigned to her platoon, and she had not properly documented the changes. The request further explained that Greany had ordered Olaechea to cease changing personnel from outside of her platoon, without his prior permission, but that she nonetheless continued to do so. The findings in Greany's request were incorporated into the findings of the ongoing investigation concerning Olaechea's alleged fraternization with Velazquez, which eventually formed the basis for the November 2, 2016 charges brought against her. In addition, the charges demonstrate that the City had non-discriminatory reasons for bringing them, because each charge identified Olaechea's alleged conduct and the specific NYPD policy it violated—none of which were based on Olaechea's protected activity. This is a sufficient showing for the City to meet its burden at the second step of the *McDonnell-Douglas* framework. *See, e.g., Kho v. N.Y. & Presbyterian Hosp.*, 344 F. Supp. 3d 705, 718, 723 (finding defendant sufficiently articulated legitimate, non-retaliatory reasons for employee's termination based in part on employee's numerous violations of defendant's policies); *Stuart v. T-Mobile USA, Inc.*, No. 14-CV-4252 (JMF), 2015 WL 4760184, at *6 (S.D.N.Y. Aug. 12, 2015) (same).

### 3. Pretext

Finally, genuine issues of material fact exist as to whether Defendants' proffered reasons for the adverse actions were merely pretext for retaliatory motives that were the true but-for cause of those actions.

First, Defendants have failed to respond to Olaechea's direct evidence of retaliation, namely, her testimony that Defendants yelled at her for "looking out for Velazquez." Olaechea Decl. ¶ 47 (further asserting that Venice and Brown made her "understand that there would be consequences . . . for helping Velazquez"); Olaechea Dep. Tr. at 74:6–10 (recalling that Venice "screamed at me, and he said, why am I looking out for Officer Velazquez?"). Nor do they respond to Sergeant Khazin's testimony that Defendants clearly disliked Velazquez and mistreated him on numerous occasions—which provides a motive for Defendants to be displeased that she was helping Velazquez. *See* Kazin Decl. at ¶¶ 21–46. While this evidence supports causation for the purposes of Olaechea's *prima facie* case, as previously discussed, she may also rely on it in attempting to establish that Defendants' asserted non-retaliatory reasons were pretextual. *See Giscombe v. N.Y.C. Dep't of Educ.*, 39 F. Supp. 3d 396, 403 (S.D.N.Y. 2014) (noting that a plaintiff may rely on evidence presented to establish a *prima facie* case in demonstrating pretext).

Second, there is circumstantial evidence that Defendants' alleged reasons for the investigation into Olaechea's relationship with Velazquez are "unworthy of credence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000). It is true that NYPD policy prohibits fraternization with a subordinate where it is "prejudicial to good order, efficiency or discipline." But the record raises triable questions of fact as to whether Defendants' motives in investigating the relationship were prompted by genuine concern that the good order or efficiency of the precinct was in jeopardy. Only after Olaechea began to complain about Velazquez's treatment— in October and December 2015, and August 2016—do Defendants appear to have started to accumulate evidence that she changed Velazquez's tours on occasion without proper documentation. Greany's September 8, 2016 letter to the Chief of Manhattan South, which

25

outlined incidents of Olaechea's alleged favoritism towards Velazquez, was based on conduct occurring between June 2016 and August 2016. Put another way, the notion that the driving force behind the investigation was because the relationship was "prejudicial to good order" is arguably inconsistent with the fact that the evidence supporting such prejudice was accumulated only after Olaechea's protected activity began, and not before. While temporal proximity alone cannot suffice to establish pretext, it is nonetheless still evidence of pretext. *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013) (noting that "a plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence . . . to defeat summary judgment").

Third, Defendants do not adequately explain why seeking the most severe form of punishment against Olaechea—namely, requesting that charges be brought against her and that she be placed on dismissal probation—was appropriate, as opposed to a more intermediate level of discipline. Both Olaechea and Khazin attest that it "is very rare that a member of service is issued Charges . . . without first receiving a command discipline[.]" Khazin Decl. ¶ 17; Olaechea Decl. ¶ 17. A command discipline is an intermediate form of discipline for "minor infractions of NYPD rules" that are "usually resolved solely within the precinct or command." Khazin Decl. ¶ 14-15; Olaechea Decl. ¶ 14-15. Olaechea further asserts—and nowhere do Defendants dispute—that she was the first person during her ten-year tenure at the 9th Precinct to have been issued charges before a command discipline, even though she had an otherwise spotless record of 23 years of service. Such selective enforcement of disciplinary measures against certain employees, and not others, is probative of retaliatory pretext. *See Ruiz v. City of Rockland*, 609 F.3d 486, 493 (2d Cir. 2010) (noting that where an employer applies its criteria for discipline in

an "inconsistent, arbitrary, or discriminatory manner, then there is a question of fact as to whether the criteria . . . merely provided a pretext for unlawful retaliation").

Defendants' contention that the conduct forming the basis of Olaechea's charges does not qualify for a command discipline is not persuasive. In support of this argument, they cite portions of the NYPD's patrol guide outlining the department's procedures for issuing command discipline and charges and providing a list of violations for which an officer "may initiate command discipline." Murrell Reply Decl. Ex. X, at 6 (Dkt. 51). It is true that the list of violations warranting command discipline do not list some of the specific conduct for which Olaechea was charged—namely, failure to document changes in the Roll Call, and showing preferential treatment towards Velazquez. But the patrol guide also notes that command discipline may be warranted for "any other minor violation that, in the opinion of the commanding/executive officer is appropriate for . . . command discipline procedure." *Id.* at 7–8. Additionally, included in the list of violations is "failure to submit reports in a timely manner" which would appear to encompass the charge brought against Olaechea for failure to timely submit overtime reports. *Id.* at 7. Greany's request that charges be initiated is rendered even more suspect by Defendants' failure to rebut the evidence supporting Olaechea's assertion that she never received a negative performance evaluation in her prior 23 years at the NYPD. Indeed, Defendants do not respond to Olaechea's testimony that at the time she was placed on Level I Monitoring and administratively transferred—which led to the initiation of charges just over a month later—her platoon was the highest performing in the Precinct. *See* Olaechea Dep. Tr. at 54:20–57:10; *Curcio v. Roosevelt Union Free Sch. Dist.*, No. 10-CV-5612 (SJF) (AKT), 2012 WL 3646935, at *15–16 (E.D.N.Y. Aug. 22, 2012) (citing cases for the proposition that a

"sudden drop-off in performance evaluations can serve as evidence that would raise an inference of retaliation").

Fourth, Defendants have failed to respond to Olaechea's testimony that other officers at the 9th Precinct engaged in romantic relationships but were not charged with misconduct. *See* Olaechea Decl. ¶¶ 48, 49, 50 (noting that during her time at the 9th Precinct two officers were separately involved in romantic relationships with two detectives also working at the precinct). Defendants do not contend that an investigation was launched into the relationship of those other employees. This disparate treatment of similarly situated employees provides further evidence of pretext. *See Mathew v. North Shore-Long Island Jewish Healty Sys.*, 582 Fed. App'x 70, 71 (2d Cir. Nov. 14, 2014) (recognizing that pretext may be established by showing that an employee was treated differently than other 'similar situated' employees); *Graham v. Long Island R.R.*, 230 F.3d 34, 43 (2d Cir. 2000) (same).

Finally, the Second Circuit has held that evidence of pretext may also include the fact that "the plaintiff's alleged harasser generated much of the evidence supporting the non-retaliatory justification." *Ibok v. Sec. Indus. Automation Corp.*, 369 Fed. App'x 210, 213 (2d Cir. 2010) (citing *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 770 (2d Cir. 1998)). Here, Defendants played a substantial role in investigating Olaechea's relationship with Velazquez. In fact, Greany drafted the document that provided the basis for her placement on performance monitoring, administrative transfer, and the initiation of charges.

In summary, there are genuine issues of material fact as to whether Defendants' alleged retaliatory motives led them to set into motion a rarely utilized process that would ultimately cause Olaechea to lose the job she had had for over two decades.

**B. NYSHRL and NYCHRL Claims Against All Defendants**

Retaliation claims under the NYSHRL are governed by the same standard as Title VII. *See Summa*, 708 F.3d at 125. Retaliation claims under the NYCHRL must be applied at least as broadly as Title VII. *See Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009). Because the City is not entitled to summary judgment on Olaechea's Title VII claims, it follows that it is also not entitled to summary judgment on her NYSHRL and NYCHRL retaliation claims.

Unlike Title VII, the NYSHRL and NYCHRL provide for individual liability in retaliation cases. *See* N.Y. Exec. Law § 296(7) (providing that it is "an unlawful discriminatory practice for any person . . . to retaliate or discriminate against any person because he or she has opposed any practices forbidden under [the NYSHRL]"); NYCHRL § 8–107(1)(7) (same with respect to practices forbidden under the NYCHRL). Individual liability under those provisions, as their text suggests, is limited to where "an individual defendant ... 'actually participates in the conduct giving rise to' the plaintiff's retaliation claim[s]." *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 366–67 (S.D.N.Y. 2012).

As explained above, the retaliation claims against the City survive summary judgment based on the retaliatory conduct of some of its employees. Defendant Greany submitted the September 8, 2016 letter which outlined incidents of Olaechea's alleged favoritism towards Velazquez; requested that she be placed on Level I Monitoring and administratively transferred; and further noted that a request would be made to initiate charges against her. In so doing, he clearly "actually participat[ed] in the conduct giving rise to the plaintiff's . . . claim[s]." *Id.* at 366 (finding individual liability under the NYSHRL and NYCHRL for retaliation claim where the defendant "suppli[ed] the intent and the complaints that may have led" to the retaliatory

conduct). Greany is therefore not entitled to summary judgment on Olaeceha's NYSHRL and NYCHRL claims against him.

The evidence with respect to Defendant Brown's personal involvement in the alleged retaliation is notably absent by comparison. Although Olaechea alleges that he yelled at her for helping Velazquez, she does not otherwise point to any evidence suggesting that he contributed to the investigation or the requests that she be disciplined, transferred, and charged. The disputed facts with respect to whether Brown intentionally broke into Olaechea's locker in October 2016 to retrieve her belongings may raise questions about his motives. But they do not otherwise provide a basis for a reasonable juror to conclude that he actually participated in the allegedly retaliatory conduct. Olaechea's retaliation claim against Defendant Brown pursuant to the NYSHRL and NYCHRL is, therefore, dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED as to Plaintiff's discrimination and hostile work environment claims in their entirety. Defendants' motion is further GRANTED with respect to Plaintiff's Title VII retaliation claim against Defendants Brown and Greany, and each of Plaintiff's retaliation claims as against Defendant Brown. Defendants' motion is DENIED with respect to each of Plaintiff's retaliation claims against the City, and her NYSHRL and NYCHRL retaliation claims as against Defendant Greany.

Trial on the remaining claims in this matter is hereby scheduled to begin on December 12, 2019. The required pre-trial submissions set forth in Rule 6 of this Court's Individual Rules & Practices in Civil Cases shall be due no later than November 26, 2019. Responses, including

oppositions to any motions *in limine*, shall be due no later than December 6, 2019. A final pre-trial conference will take place at 3:30 p.m. on December 13, 2019.

The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 36.

SO ORDERED.

Dated:    September 30, 2019
           New York, New York

Ronnie Abrams
United States District Judge