USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 08/09/2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANGELIQUE OLAECHEA,

                              Plaintiff,

                v.

THE CITY OF NEW YORK and CAPTAIN
VINCENT GREANY,

                              Defendants.

---

No. 17-CV-4797 (RA)

OPINION AND ORDER

---

RONNIE ABRAMS, United States District Judge:

In June of 2017, Plaintiff Angelique Olaechea, a former police officer with the New York City Police Department ("NYPD") initiated this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 296; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*  Plaintiff alleged that she was discriminated against, retaliated against, and subjected to a hostile work environment based on her Hispanic origin as well as her protected activity of submitting discrimination complaints on behalf of one of her subordinates.  She sued the City of New York, her former supervisor Captain Vincent Greany, and Administrative Lieutenant Daniel Brown.  Defendants contended that any adverse actions taken against Plaintiff were prompted by legitimate issues with her performance, not her protected characteristics or activity.  Only Plaintiff's claims for retaliation against the City and Greany proceeded to trial. After an eight-day trial, the jury returned a verdict in Plaintiff's favor against the City on her Title VII, NYSHRL, and NYCHRL claims, and against Greany on her NYCHRL claim.  It awarded

Plaintiff $872,892.60, which was to be paid in full by the City, for "lost wages" and for "salary but for retaliation minus pension."

Now before the Court are (1) Defendants' motion for judgment as a matter of law as to Greany's liability; (2) Defendants' motion for remittitur of the jury's front pay award; and (3) Plaintiff's motion for attorneys' fees. Defendants' motion for judgment as a matter of law is granted and Greany is dismissed from the case. Defendants' motion for remittitur is granted in part, as the Court reduces the jury's front pay award to award Plaintiff only five years of front pay. Finally, Plaintiff's motion for attorneys' fees is granted, albeit with modifications to counsel's hourly rate and the number of hours billed.

## BACKGROUND

The Court assumes the reader's familiarity with the facts and procedural history of this case and discusses only the evidence adduced at trial that is relevant to the instant motions.

Plaintiff began working as a police officer for the City of New York in 1995. Trial Tr. at 439:6-8. In 2008, she was promoted to Lieutenant and Platoon Commander and transferred to the 9th Precinct on the Lower East Side of Manhattan. *Id.* at 69:20-24. While at the 9th Precinct, Plaintiff directly supervised Officer Javier Velazquez. *See id.* at 70:18-71:3.

Rumors that Plaintiff's and Velazquez's relationship was romantic in nature surfaced sometime on or before July 10, 2015, when Plaintiff reported to her supervisor, Deputy Inspector Peter Venice, that a note had been passed to or left for Velazquez at work that read: "PO Velazquez, stop fucking Lieutenant Olaechea." *Id.* at 1054:25-1055:5, 1057:1-7. At some point after the note was reported, an investigation into the nature of Plaintiff's and Velazquez's relationship began; in the course of this investigation, Venice contacted the Internal Affairs Bureau and spoke with the Office of Equal Employment Opportunity ("OEEO"). *See id.* at 419:1-15, 1116:16-1117:1.

Defendants admit that fraternizing with a subordinate is not a violation of NYPD rules or policies. *See id.* at 863:15-20, 1007:1-4, 1118:11-16.  Nonetheless, Plaintiff has consistently denied being romantically involved with Velazquez.  *Id.* at 299:21-300:10.

On October 26, 2015, December 23, 2015, and August 10, 2016, Plaintiff filed three OEEO complaints on behalf of Velazquez based on discrimination he had purportedly experienced, in accordance with NYPD policy requiring supervisors to submit such complaints on behalf of their subordinates.  *Id.* at 71:9-13, 325:3-8, 93:11-15, 332:3-15.  On September 14, 2016, Plaintiff also testified at Velazquez's departmental trial (the details of which are not relevant here) on his behalf. *Id.* at 148:20-149:11.  In her testimony, she asserted that Velazquez had been discriminated against and subjected to a hostile work environment because of his ethnicity.  The parties do not dispute that the three OEEO complaints, as well as the September 14, 2016 testimony, constitute protected activity by Plaintiff.

On June 15, 2016, Captain Vincent Greany became the commanding officer of the 9th Precinct and Plaintiff's supervisor.  *Id.* at 1197:21-25.  During a briefing with Venice, the outgoing commanding officer, Venice informed Greany that he had "split . . . up" Plaintiff's and Velazquez's shifts.  Greany testified that during this briefing, Venice did not mention any OEEO complaints.  *Id.* at 1200:13-20.  Greany then asserted that shortly after his arrival, he encountered numerous issues with Plaintiff's performance, largely relating to her alleged favoritism or other inappropriate behavior toward Velazquez.  Specifically, he observed that Plaintiff regularly failed to account for Velazquez on roll call; that several other supervisors complained about Plaintiff moving Velazquez's shifts to coincide with her shifts without permission; and that Plaintiff had failed to document a request for Velazquez to take last-minute leave.  *See id.* at 1203:1-1212:23. According to Greany, other sergeants and lieutenants became "frustrated" with Plaintiff's

behavior. *Id.* at 1213:1-6. In response to these issues, Greany ordered an integrity officer to review Plaintiff's and Velazquez's personnel records to see if there was a history of their sick days and vacation days correlating. *See id.* at 1213:10-23. After this investigation, Greany contacted the Manhattan South investigations unit for "direction" and "guidance." *See id.* at 1214:21-1215:6. Manhattan South informed Greany that there was an open investigation into Plaintiff and Velazquez and instructed Greany to provide Manhattan South with any information he had to incorporate into that larger investigation. *Id.* at 1215:13-16, 1216:11-12 ("They just said, whatever you have, give it to us, and we'll take it from you."). The Chief of Manhattan South also directed Greany to "put in a request for [Plaintiff's] administrative transfer." *Id.* at 1217:18-19.

According to Greany, on September 8, 2016, he "followed [those] orders" by submitting a request that Plaintiff be administratively transferred from the 9th Precinct. *Id.* at 1218:8-10, 1220:19-1221:17. In the memo documenting the request, Greany wrote that Plaintiff had engaged in a "pattern of unacceptable behavior," which included "showing favoritism" toward Velazquez "by changing his tour . . . and assignments numerous times" and "blatantly disregard[ing]" Greany's directions that she cease doing so. *Id.* at 1222:8-17. Greany noted in the memo that he had consulted with OEEO of his intent to request Plaintiff's transfer and that the office had no objection. *Id.* at 1239:19-1240:1. He also described his conversation with Manhattan South during which he learned of the ongoing investigation and explained that "[a]s a result of that consultation, the above-referenced misconduct" described in the memo had been "incorporated into the existing [Manhattan South] case." *Id.* at 1308:7-16. Greany also stated that "a request for charges and specifications against Lieutenant Olaechea w[ould] be submitted to the department advocates office at the conclusion of the investigation." *Id.* at 1308:13-18. He closed the memo by asserting that it was "evident that [Plaintiff] has a relationship with Police Officer Velazquez that goes

beyond the conventional supervisor-to-subordinate relationship" and that Plaintiff had "engaged in a course of conduct that shows a lack of professionalism, poor leadership skills, and ha[d] lost the confidence of the commander to be an effective supervisor." *Id.* at 1240:12-17.

Sometime around September 19, 2016, Plaintiff was placed on Level I monitoring, a "low[] level . . . disciplinary measure for an officer that is either not performing properly or has engaged in misconduct." *Id.* at 1294:4-20.  Around September 30, 2016, she was transferred to the 79th Precinct in Brooklyn. *Id.* at 153:5-8, 172:7-9.  She contends that her pay was reduced in a variety of ways as a result of the transfer. *Id.* at 211:11-214:3.

In October 2016, Plaintiff filed a discrimination complaint with OEEO, alleging that Greany had transferred her, placed her on performance monitoring, and lodged false allegations against her in retaliation for her complaints and testimony on Velazquez's behalf. *See id.* at 380:8-11.  According to Plaintiff, she never received the results of that complaint. *Id.* at 381:16-19 ("Q. And [OEEO] found no retaliation; correct?  A. I don't recall.  I never got the results from it.").

On November 2, 2016, the NYPD's Department Advocates Office initiated charges and specifications—the highest form of NYPD disciplinary proceedings, *id.* at 144:19-24—against Plaintiff in two separate cases for various alleged misconduct. *Id.* at 159:16-19.  Of these charges, the most relevant to this case alleged that Plaintiff:

1. "on or about June 26th, 2016, having performed an overtime tour, wrongfully failed to sign the command log upon ending the tour early, and wrongfully failed to submit an overtime report in a timely manner," *id.* at 1254:4-7;
2. "between June 25th and June 26th [2016], wrongfully granted an emergency day to a member of the service when she was not the on-duty 9th precinct desk officer, and failed to ensure that the roll call was adjusted and that a leave of absence report was submitted," *id.* at 1255:12-16;
3. "between August 6, 2016 and August 7, 2016, wrongfully failed to comply with a lawful direction given by Captain Vincent Greany in that after having been directed not to make changes to roll calls for members of the service not assigned to her platoon, said lieutenant changed the assigned tour or assignment in roll calls for a member of the service not assigned to her platoon," *id.* at 361:8-14; and

5

4. "between February 21st, 2014 and October 1st, 2016, engaged in conduct prejudicial to the good order, efficiency, or discipline of the Department.   Said lieutenant wrongfully showed preferential treatment and favoritism towards a member of the service, Police Officer Velazquez," *id.* at 162:13-17.

A disciplinary trial was held over several days between July and November 2017.   On February 5, 2018, an Assistant Deputy Commissioner issued a report finding Plaintiff guilty of the majority of these charges—including the charge that she showed preferential treatment and favoritism to Velazquez.   *See id.* at 1258:3-5.   In March 2018, Plaintiff was placed on dismissal probation and required to forfeit thirty vacation days.[1]   *Id.* at 168:2-8, 170:14-19.   On June 30, 2018, 15 years before her would-be retirement age, Plaintiff retired from the NYPD.   She asserted that she did so to ensure her pension, which she would not be entitled to if she was dismissed during the probationary period.   *Id.* at 170:23-171:15, 397:3-6.

Although the Court dismissed Plaintiff's discrimination and hostile work environment claims earlier in the litigation, trial was held on her retaliation claim on July 26, 2021.   Upon the close of Plaintiff's case-in-chief, Defendants moved for judgment as a matter of law as to Greany's liability on the basis that Plaintiff had not shown Greany's actual knowledge of Plaintiff's protected activity at the time of his participation in the alleged retaliatory conduct.   *Id.* at 775:21-7768:12.   The Court reserved ruling.   *Id.* at 782:2-3.   Defendants revisited that motion during jury deliberation, and the Court again reserved pending the jury's verdict.   *Id.* at 1511:10-1512:11.

After the Court had instructed the jury using instructions that the parties had agreed on, and after the jury had retired to deliberate, Plaintiff made an untimely objection to the instructions, requesting that they be modified to explicitly address the possibility of front pay damages.   *Id.* at

---

[1] As was explained at trial, dismissal probation is a form of punishment in which an officer is dismissed, but the imposition of that dismissal is delayed for a one-year period during which the officer's conduct is monitored.   If the officer successfully completes the probationary year without any additional infractions, the dismissal penalty is waived and the officer is returned to non-probationary status; if the officer commits further misconduct, he or she may be summarily dismissed without a hearing or other process.   *Id.* at

1475:2-1478:20.  The Court found that the failure to instruct the jury on the specific issue of front

pay did not affect Plaintiff's substantial rights and accordingly declined to hear her untimely

objection.  *Id.* at 1506:2-1508:22.

After deliberations, the jury returned a ruling for Plaintiff, finding that the City was liable

for retaliation under Title VII, the NYSHRL, and the NYCHRL, and that Greany was individually

liable for retaliation under the NYCHRL.  *See* Hatcliffe Dec. Ex. C at 1-2 (verdict form).  The jury

awarded Plaintiff $872,892.60 in "economic damages," consisting of $174,578.52 in "lost wages"

and $698,314.08 in "salary but for retaliation minus pension"—all of which the jury specified were

to be paid by the City, not Greany.  *Id.* at 2-3.  The jury further found that Plaintiff was entitled to

legal fees in an unspecified amount.  *See id.*[2]

These written motions followed.  On May 9, 2022, the Court heard oral argument, and on

June 8, 2022, it held an evidentiary hearing at which Plaintiff testified about her efforts to mitigate

her damages and her prospects of obtaining alternative employment in the future.

## DISCUSSION

**I.      Defendants' Motion for Judgment as a Matter of Law as to Greany's Liability**

**A.      Legal Standard**

Federal Rule of Civil Procedure 50 provides that, after "a party has been fully heard on an

issue" but "before the case is submitted to the jury," it may move for judgment as a matter of law

on the ground that "a reasonable jury would not have a legally sufficient evidentiary basis to find

for the [non-moving] party."  Fed. R. Civ. P. 50(a).  The movant "must specify the judgment sought

---

[2] Plaintiff also asserts that she was awarded emotional distress damages and moves to "sustain" the jury's purported
award of such damages.  Her only support for this assertion, however, is a citation to item seven on the verdict form,
which, in response to the question "What amount of non-economic damages, if any, is Angelique Olaechea entitled
to?" states only: "Legal fees."  Hatcliffe Dec. Ex. C at 2.  The Court has little trouble finding that the jury did not
intend to award Plaintiff emotional distress damages, and thus denies Plaintiff's motion to the extent it indeed seeks
such damages.

and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2).  Where, as here, the issue has been reserved, the moving party "may file a renewed motion for judgment as a matter of law and include an alternative or joint request for a new trial under Rule 59."  Fed. R. Civ. P. 50(b).  "In ruling on a renewed motion, the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." *Id.*

The Second Circuit has explained that judgment as a matter of law may be granted when "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it." *Meloff v. New York Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir. 2001).[3]  "In assessing the sufficiency of evidence to support a jury verdict, [the Court] must view the record in the light most favorable to the opposing party, assuming all reasonable inferences were drawn and all credibility disputes resolved in its favor."  *Advance Pharm., Inc. v. United States*, 391 F.3d 377, 390 (2d Cir. 2004).  Accordingly, a movant's burden under Rule 50 is a heavy one, particularly where, as here, "the jury has deliberated in the case and actually returned its verdict" in favor of the non-movant.  *Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005).

**B.  Discussion**

Defendants argue that there was insufficient evidence presented at trial for the jury to conclude that Greany had knowledge of Plaintiff's protected activity on or before September 8, 2016—the approximate date on which he provided information to Manhattan South that was

---

[3] Unless otherwise noted, case quotations omit all internal quotation marks, citations, alterations, and footnotes.

incorporated into Plaintiff's charges and specifications and requested her administrative transfer—meaning that he cannot have knowingly participated in retaliatory conduct.  The Court agrees.

For an individual defendant to be liable for retaliation under the NYCHRL, he must have "actually participated in the conduct giving rise to the plaintiff's" claims.  *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 366 (S.D.N.Y. 2012); *accord Feingold v. New York*, 366 F.3d 138, 158-59 (2d Cir. 2004) ("Employees may be held personally liable under the NYSHRL and the NYCHRL if they participate in the conduct giving rise to a discrimination claim.").  Such participation requires retaliatory "intent," *Malena*, 886 F. Supp. 2d at 366—and therefore necessarily requires an individual's knowledge of the protected activity at the time of his participation.  To show knowledge of protected activity, "it is not sufficient that an employer could or even should have known about an employee's complaint."  *Cf. Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1122 (7th Cir. 2009) (discussing the similar Title VII standard for employer knowledge).

Greany became Plaintiff's commanding officer in the summer of 2016, after she had already filed two of her three EEO complaints on behalf of Velazquez, but before her third complaint and before her testimony in Velazquez's departmental trial.  During trial, Greany consistently disavowed knowledge of Plaintiff's protected activity at the time he (1) submitted his September 8, 2016 memo and (2) provided information unrelated to her protected activity to other NYPD offices that was used in preparing Plaintiff's charges and specifications.

Plaintiff argues that the following facts were established at trial and are sufficient evidence of Greany's knowledge: (1) her testimony regarding a late September conversation between Greany and Plaintiff in which she accused him of retaliating against her by requesting her transfer; (2) Venice's testimony that he briefed Greany on the "issues" involving Plaintiff and Velazquez;

(3) Greany's purported access to a "witness list" for Velazquez's departmental trial, which would have included Plaintiff's name; (4) Greany's testimony that he had a conversation with the OEEO in September 2016 about his intent to transfer Plaintiff; (5) Greany's testimony that he had a conversation with the Department Advocates office in September 2016 about his intent to transfer Plaintiff; and (6) Plaintiff's absence from work on September 14, 2016 to testify at Velazquez's trial.

Most of this evidence is not probative of Greany's knowledge, even on a circumstantial basis. First, Plaintiff relies on her testimony that when she learned she had been administratively transferred on or about September 30, 2016, she went to Greany's office, "asked him . . . [w]hy am I being admin transferred?," and "told him that . . . discrimination was going on here." Trial Tr. at 432:2-4. Although Greany confirmed that Plaintiff "came into [his] office" following her transfer and "asked why was this happening to her," *id.* at 1260:24-1261:2, he denied that she complained of discrimination or retaliation, *see id.* at 1278:20-25 ("Q: You had a conversation with Lieutenant Olaechea [after you transferred her], correct?  A: There was no conversation. I testified that she came to my office when she found out she was being transferred. She was very emotional. She cursed at me. There was a union delegate in the room, and she did not report any discrimination at that time in my office."). Even crediting Plaintiff's testimony that she complained of retaliation during this conversation, it occurred only *after* she had been transferred, and thus cannot prove that Greany knew about any protected activity *before* he transferred her. Similarly, even if Greany learned of Plaintiff's protected activity once she testified at Velazquez's departmental trial on September 14, her testimony post-dated the allegedly retaliatory behavior.

Second, Plaintiff relies on the proposition that Greany had access to a witness list for Velazquez's departmental trial, and thus knew that Plaintiff was planning to testify at that trial.

But the only time a "witness list" was mentioned at trial was in the following exchange during

Greany's cross examination:

> MR. NWOKORO: And before the departmental trial, a list of witnesses was exchanged
> between the parties, between the Velazquez party and the department's party; correct?
> MR. HATCLIFFE: Objection, your Honor.  He had nothing to do with that.
> THE COURT: Do you know the answer to that?
> GREANY: I do not, your Honor.
> . . .
> MR. NWOKORO: You were involved in Olaechea's departmental trial; correct?
> GREANY: I testified at her trial, yes.
> MR. NWOKORO: As a witness in that trial, you received a list of witnesses in the trial that
> informed you that you would be a witness in the trial; correct?
> GREANY: I never saw a list.
> MR. NWOKORO: As commanding officer of the 9th precinct, you had access to such lists;
> correct?
> GREANY: No.  I did not have access to a list, no.

*Id.* at 1325:2-1326:9.  Indeed, it was only during Plaintiff's counsel's summations that anyone at

trial asserted the existence of a witness list.  *Id.* at 1416:6-8.  But statements of counsel, whether

in the form of questions or in the form of summations, do not constitute evidence.  *See* Diamond

Modern Federal Jury Instructions—Civil 3.1 (2022); *United States v. Arboleda*, 20 F.3d 58, 61 (2d

Cir. 1994) ("A summation is not evidence.").  Without any evidence establishing the existence of

a witness list, the jury may not have relied on such a list to infer Greany's knowledge that Olaechea

was planning to testify at Velazquez's departmental trial.

Third, Plaintiff cites Greany's testimony that he discussed his intention to transfer Plaintiff

with OEEO and the Department Advocates' office.  *See* Trial Tr. at 1217:20-1218:4, 1238:25-

1239:18, 1283:8-15, 1285:12-18, 1323:18-1324:23.  But nowhere in the record is there any

suggestion that Greany either mentioned or was informed about Plaintiff's protected activity

during these conversations.  While Plaintiff insists these discussions "must necessarily [have]

reference[d] Olaechea's EEO status and any complaints filed by her," Pl. MOL at 4, such an

inference amounts to speculation.  The reasons Greany gave in his memo for requesting Plaintiff's

transfer discussed only her performance issues—and no evidence was introduced establishing or even suggesting that knowledge of these performance issues, or even knowledge of the investigation into Plaintiff's and Velazquez's relationship, would necessarily have conferred knowledge of her unrelated protected activity.

The Court is thus left with Venice's testimony that when Greany took over the precinct, Venice informed him "that there was this issue going on with Lieutenant Olaechea and Officer Velazquez, and [that Venice] had changed [Velazquez's] tour and that they were separated due to . . . an ongoing investigation" regarding their relationship. *Id.* at 1091:10-13; *see also id.* at 1092:4-8 ("Q. Would it be fair to say that you had a 15-minute conversation about the precinct in general, and in [the] course of that conversation, this relationship and the issues associated with it were mentioned?  A. Yes.").  Venice denied, however, that he had informed Greany "about the EEO complaints that had been made" during that conversation.  *Id.* at 1093:12-14 ("Q. Sir, you told [Greany] about the IAB investigation, but did you tell him about the EEO complaints that had been made?  A. No, I didn't.").  Greany similarly testified that Venice had not told him about any EEO complaints during the briefing about Plaintiff and Velazquez and that the OEEO had never contacted him about ongoing complaints.  *Id.* at 1200:9-1201:1.  According to Plaintiff, notwithstanding these denials, the jury could reasonably have inferred that Venice's report to Greany included a discussion of Plaintiff's EEO complaints, because her complaints were one of the "issues" associated with her and Velazquez's purported relationship.

In addition to the conversation between Venice and Greany, the Court highlights one piece of evidence not raised in the parties' briefs: Venice's acknowledgment that when a commanding officer is "assigned to a new command," as Greany was here, they must be "briefed on the pending EEO issues" in their command, *id.* at 1131:22-25—and that under patrol guide procedure, "when

an EEO complaint is filed by a member of service, the EEO has to notify the commanding officer

of that member of service," *id.* at 1146:13-17. Venice also testified, however, that he did not recall

whether such a briefing had occurred in this particular case and that he did not have any "idea" of

what EEO complaints were ongoing at the 9th Precinct when he arrived. *See id.* at 1132:2-5 ("I'm

going to be honest with you, [the briefing] doesn't always happen. I know that—I don't recall if

it did when I got to the 9th, I don't recall if I did that, you know, briefing. I know it's written in

the patrol guide, but sometimes it's not done."), 1181:25-1182:2. Moreover, Defendants' counsel

produced the relevant patrol guide sections and elicited testimony from Venice that, under the

language of the policy, OEEO would notify a commanding officer of a complaint only "if and

when appropriate." *Id.* at 1180:18-1182:8.[4]

Having cited all the potentially relevant trial evidence, the Court considers its sufficiency.

In arguing that the evidence was insufficient, Defendants rely heavily on a case from the Eastern

District of Pennsylvania, *Gillyard v. Geithner*, 81 F. Supp. 3d 437 (E.D. Pa. 2015). In *Gillyard*,

the plaintiff alleged that his employer retaliated against him by refusing to rehire him after he filed

complaints of racial discrimination. *Id.* at 439. The court held that, in the face of the relevant

individuals' denial of knowledge of the plaintiff's protected activity, his unsupported assertions

that other individuals "discussed or could have discussed" his complaints with them were

insufficient to survive summary judgment. *See id.* at 445-47. A Third Circuit case on which

---

[4] In opposing Defendants' Rule 50 motion when it was first made during trial, Plaintiff argued that Velazquez had testified that he went to Greany on three separate occasions to complain about the discrimination he was suffering, the same discrimination that Plaintiff reported. *See* Trial Tr. at 779:1-5. But Velazquez testified only that he had *attempted* to speak to Greany—indeed, he professed on the stand that he did not know what Greany looked like, suggesting that no such conversation had taken place. *See id.* at 627:2-4 ("I don't even know how Greany looks like, I don't know if that's Greany or if this is Greany."), 1261:13-18 ("Q: Did [Velazquez] ever come to you, and did he ever ask you for anything? A [Greany]. Never. Q. Did you really ever have any type of conversation with him whatsoever? A. No.").

*Gillyard* relies, *Daniels v. School District of Philadelphia*, 776 F.3d 181 (3d Cir. 2015), took a similar approach to speculative evidence:

> Daniels . . . cannot establish that there was a causal connection between her protected activities and the hostile work environment that she allegedly experienced from September 2010 to December 2011. The persons responsible for this alleged harassment . . . all testified that they lacked knowledge of Daniels's protected conduct. As the basis for establishing such knowledge, Daniels points to the unexplained hostility of these individuals toward her immediately upon her arrival at each of the schools. We recognize that when there is a brief period of time between an adverse actor's learning of a plaintiff's protected conduct and a subsequent adverse action, it may be reasonable to infer that there was a causal link between the two events. But the temporal proximity of adverse action to protected conduct does not establish that the adverse actor had knowledge of the protected conduct before acting. Furthermore, Daniels cannot justifiably rely on mere speculation that these adverse actors learned of her complaints from other employees in the school district.

*Id.* at 197. District courts in this circuit have rejected similarly speculative evidence of an individual's knowledge, particularly when such evidence turns on "rumor mill" logic. *See, e.g.*, *Mangiafico v. Blumenthal*, No. 04-CV-0074 (MRK), 2007 WL 283115, at *7 (D. Conn. Jan. 30, 2007) (finding a plaintiff's argument that defendants would have learned of his intent to sue through workplace "rumor mills" to be "speculative"); *Fisher v. Town of Windsor*, No. 94-CV-02050 (AHN), 1997 WL 76669, at *5 (D. Conn. Feb. 7, 1997) (rejecting a plaintiff's argument that "her retaliators must have known of her complaints because the filing of her federal suit could not have remained a secret in such a small department" and observing that "[a]lthough knowledge may be shown by circumstantial evidence, there must be some facts in evidence supporting an inference of actual knowledge"); *Alban-Davies v. Credit Lyonnais Sec. (USA) Inc.*, No. 00-CV-6150 (DLC), 2002 WL 498630, at *7 (S.D.N.Y. Mar. 29, 2002) (finding that a plaintiff had failed to raise sufficient evidence of his supervisor's knowledge of his protected activity in part because the plaintiff's "age discrimination complaint did not involve [the supervisor] in any way, and the

plaintiff ha[d] not identified any reason that those within [the organization] who knew of the EEOC filing would have discussed it with" that supervisor).

The reasoning of these cases is applicable here, and the demanding standard of Rule 50 has been met.  Even considering the record at trial in the light most favorable to Plaintiff, the evidence of Greany's knowledge crosses the line from circumstantial to speculative.  Plaintiff's theory of Greany's knowledge relies, at bottom, on assumptions that he must have been informed of her protected activity through certain conversations with Venice, OEEO, or other NYPD officials—but she has identified no reason why those conversations would have touched on her protected activity, which is an issue distinct from the issue of her purported favoritism toward Velazquez. Nor does the testimony about the NYPD patrol guidance allow for a reasonable inference that Greany was in fact briefed about Plaintiff's EEO complaints, as this evidence supports only the conclusions that he may have been so briefed—not that he was.  Finally, Plaintiff cannot prove Greany's knowledge based on the temporal proximity between her August 2016 complaint and Greany's memo: temporal proximity is relevant only to the causation element of retaliation, which the Second Circuit treats as distinct from the knowledge element, *see, e.g.*, *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010).

In short, Plaintiff "cannot simply substitute utter speculation for the competent proof that would be necessary to permit rational inferences by a jury of . . . [Greany's] retaliation." *Schupbach v. Shinseki*, 905 F. Supp. 2d 422, 437 (E.D.N.Y. 2012).  Accordingly, Defendants' motion for judgment as a matter of law with respect to Greany's individual liability is granted.

## II.     Defendants' Motion for Remittitur of the Jury's Front Pay Award

### A.     Legal Standard

"Remittitur is the process by which a court compels a plaintiff to choose between reduction

of an excessive verdict and a new trial." *Stampf v. Long Island R. Co.*, 761 F.3d 192, 204 (2d Cir. 2014). The Second Circuit has "found remittitur appropriate in at least two distinct kinds of cases: (1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken, . . . and (2) more generally, where the award is intrinsically excessive in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error." *Trademark Rsch. Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 337 (2d Cir. 1993). "Remittitur may also be warranted where it can be demonstrated that the jury awarded specific amounts of damages that were not supported by the record." *Tse v. UBS Fin. Servs., Inc.*, 568 F. Supp. 2d 274, 287 (S.D.N.Y. 2008) (citing *Trademark*, 995 F.2d at 337). In considering remittitur on a state law claim, "[t]he role of the district court is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered." *Stampf*, 761 F.3d at 204. When New York courts consider the reduction of damages that are awarded under state law, they often employ the three-part test articulated in *Matter of N.Y.C. Transit Authority v. State Division of Human Rights*, 577 N.E.2d 40 (N.Y. 1991), which considers (1) "whether the relief was reasonably related to the wrongdoing," (2) "whether the award was supported by evidence," and (3) "how it compared with other awards for similar injuries," *id.* at 46. "New York law does not countenance damage awards based on speculation or conjecture." *Trademark*, 995 F.2d at 334.

### B.    Discussion

#### 1.    The Jury's Front Pay Award

The jury awarded Plaintiff $174,578.52 in "lost wages" and $698,314.08 in "salary but for retaliation minus pension." Both the Court and the parties construe the former figure as a back

pay award and the latter figure as a front pay award.  While "back pay [runs] from the date of [plaintiff's] termination until the date of judgment," *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 144 (2d Cir. 1993), "front pay is . . . money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement," *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001).  The parties agree that the back pay award may stand, and that prejudgment interest on that award is appropriate.  But Defendants argue that the front pay award must be vacated, both because the Court did not instruct the jury on front pay and because there was insufficient evidence at trial to support a front pay award.

As an initial matter, the jury was not precluded from awarding front pay solely on the basis that it was not specifically instructed on that issue.  The Second Circuit has rejected the argument that a "front-pay award must be vacated because the district court failed to instruct the jury in adequate detail regarding the factors to consider in determining an appropriate amount of front pay." *Broadnax v. City of New Haven*, 141 F. App'x 18, 23 (2d Cir. 2005).  To the contrary, such an award may be sustained if it is based on instructions to "apply sound judgment[ and] common sense in reaching the proper amount of damages" and that "there must be evidence to establish damages." *Id.*  Specifically, the court in *Broadnax* explained that "where the fundamental principle to be applied was simple—if Broadnax lost compensation due to her termination, she was entitled to damages"—it could not "conclude that the district court's instruction to the jury to calculate Broadnax's damages based on the evidence presented meets the plain error standard."  *Id.* at 24. District courts in this Circuit have interpreted *Broadnax* to stand for the proposition that, as long as a court instructs a jury to tether its damages award to lost compensation, a front pay award is proper. *See, e.g.*, *Johnson v. Strive E. Harlem Emp. Grp.*, 990 F. Supp. 2d 435, 455-56 (S.D.N.Y. 2014) (finding that instructions that a jury "must award [Plaintiff] such sum as [it] find[s] by the

preponderance of the evidence will fairly and justly compensate the Plaintiff for any damages [it] find[s] she sustained as a direct result of the Defendants' unlawful conduct" permitted the jury to award front pay).

Here, although the Court never used the term "front pay"—given that neither side had requested it do so at any point before it issued the jury instructions—its instructions were similar to those approved in *Broadnax* and *Johnson*.  The Court explained that compensatory damages "are designed to award just and fair compensation for the loss, if any, which resulted from a defendant's violation of the law"; stated that if the jury found that any Defendant had acted unlawfully, Plaintiff "may be entitled to the back pay that she would have earned if the defendants had not retaliated against her"; and instructed that "[i]n terms of calculating economic damages, the amount consists of the wages and employee benefits that the plaintiff would have received but for the retaliatory treatment"—treatment that consisted of Plaintiff's constructive discharge forcing her to retire fifteen years before she otherwise would have done.  Trial Tr. at 1466:10-19, 1467:6-8.  These instructions were sufficiently specific to allow a front pay award.

Moreover, there is no question that the jury had authority to award front pay under the NYSHRL and the NYCHRL.  Because the jury verdict "made no distinction" as to whether damages were awarded under Title VII, the NYSHRL, or the NYSHRL, "the Court can consider the entire award of damages as if it were allocated to [Plaintiff's] claim under the NYCHRL" or NYSHRL.  *Thomas v. iStar Fin., Inc.*, 508 F. Supp. 2d 252, 258 (S.D.N.Y. 2007); *accord Singleton v. City of New York*, 496 F. Supp. 2d 390, 393 (S.D.N.Y. 2007), *aff'd*, 308 F. App'x 521 (2d Cir. 2009).  And under both the city and state laws, front pay is a legal remedy that may be awarded by a jury.  *See, e.g.*, *Thomas*, 508 F. Supp. 2d at 258 ("[U]nder state human rights law . . . front pay is a legal remedy to be decided by the jury."); *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176,

1189 (2d Cir. 1992) ("[A]ll money damage awards under New York's Human Rights Law are legal remedies."); *Shannon v. Fireman's Fund Ins. Co.*, 136 F. Supp. 2d 225, 228 n.3 (S.D.N.Y. 2001) ("[F]ederal courts applying New York law have found that the question as to whether a plaintiff is entitled to an award of back or front pay should generally be decided by a jury.").

That said, the Court finds—as it preliminarily concluded during the May 9 oral argument—that the jury did not have sufficient evidence to award Plaintiff any amount of front pay.[5] As with all damages awards, "an award of front pay cannot be unduly speculative." *Dunlap–McCuller v. Riese Org.*, 980 F.2d 153, 159 (2d Cir. 1992). Rather, front pay may be awarded only when the "factfinder can reasonably predict that the plaintiff has no reasonable prospect of obtaining comparable alternative employment." *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1182 (2d Cir. 1996). Moreover, a plaintiff seeking front pay must "exercise reasonable diligence in mitigating damages by seeking alternative employment." *Id.* Reviewing the trial record, it is clear that the jury was presented no evidence regarding Plaintiff's prospects of finding, or efforts to find, alternative employment, meaning that its award of front pay cannot be sustained. Indeed, Plaintiff's counsel admitted that there was no "testimony that [Plaintiff] sought alternative employment or was unable to find substitute employment." Trial Tr. at 1502:11-14. For instance, Plaintiff did not testify or present evidence that her skills are so "unique and narrowly focused" that she has poor prospects of obtaining comparable employment—either as a police officer in

---

[5] As the Court instructed the jury, *see* Trial Tr. at 1466:19-1467:5, an award of front pay and back pay is available only if Plaintiff has shown constructive discharge. *See Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 168 (2d Cir. 1998) (approvingly discussing jury instructions that front pay could be awarded only upon a finding of constructive discharge); *Todaro v. Siegel Fenchel & Peddy, P.C.*, No. 04-CV-2939 (JS) (WDW), 2008 WL 11446818, at *6 (E.D.N.Y. Aug. 11, 2008) ("Although the Second Circuit has not yet ruled on this issue, other circuits as well as district courts in this Circuit, have held that front pay and back pay are not available as damages to plaintiffs who cannot establish that they were constructively discharged."). The jury's award of back pay after Plaintiff's resignation date and of front pay suggests that the jury found Plaintiff had proven she was constructively discharged. As Defendants do not challenge that implicit finding or the jury's back pay award, the Court accepts for purposes of this motion that Plaintiff proved her constructive discharge.

another precinct or in another role in which she could utilize her skills. *Cf. Padilla v. Metro-North Commuter R.R.*, 92 F.3d 117, 126 (2d Cir. 1996) (affirming award of over twenty years of front pay for a former Metro-North superintendent of train operations given his "unique and narrowly focused skills").[6]  Accordingly, the jury's front pay award must be remitted in its entirety for a "specific error"—namely, that it was "impermissibly speculative." *Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 51-52 (2d Cir. 2015) (remitting a speculative "lost opportunity" damages award).

Nonetheless, the Court may, in its discretion, award Plaintiff front pay under Title VII. *See, e.g.*, *Reed*, 95 F.3d at 1182 ("Front pay [under Title VII] is awarded in the sound discretion of the district court."); *Thomas*, 508 F. Supp. 2d at 258 ("Under Title VII, front pay is unquestionably an equitable remedy to be decided by the Court.").  Accordingly, the Court considers whether the additional evidence adduced at the June 8, 2022 evidentiary hearing supports a front pay award, and if so, of what amount and duration.

## 2. The Court's Front Pay Award

Prior to the evidentiary hearing, Plaintiff submitted an affidavit in which she averred that she does "not have any training or experience in any area other than law enforcement"; that she has "tried to get another job in law enforcement without success," including by making "enquiries for positions at the Nassau County Sheriff's Department and the Deer Park Police Department"; and that she is "constantly searching for a suitable position in law enforcement by examining the classified sections of news publications and by use of search engines on the internet" but has not

---

[6] At argument, Plaintiff's counsel asserted that Plaintiff had indeed testified that she would be unable to find alternative employment.  He did not, however, cite to any portion of the record supporting this assertion, and the Court has been unable to identify any such testimony.  Indeed, it appears that the only time potential alternative employment was mentioned was when Plaintiff answered the question "So you are free to get another job if you'd like, is that fair?" in the affirmative.  Trial Tr. at 400:11-13.

secured comparable employment.  Olaechea Dec. at 1-2.  She also asserted that her skills "do not translate to any other career" outside law enforcement.  *Id.* at 2.

At the evidentiary hearing, Plaintiff elaborated on her employment history following her June 30, 2018 separation from the NYPD and her continued job search.  She testified that during December of 2018 and during unspecified periods in 2019 and 2020, she worked as a private security guard.  *See* Hearing Tr. at 31:15-19, 32:11-23, 36:13-25, 39:16-24; Hearing Ex. 3 at 21; Hearing Ex. 4 at 27; Hearing Ex. 5 at 26.  She also worked for a chauffeur service in 2019.  Hearing Tr. at 37:17-38:2.  Each of these positions paid approximately $25 per hour—far less than her NYPD salary.  *Id.* at 32:23-24, 33:13-15, 37:1-2, 38:3-5, 40:6-7.  According to Plaintiff, she utilized few of the skills she had developed at the NYPD in these jobs.  *See, e.g.*, *id.* at 37:12-14 (explaining that her private security duties were simply to "watch the door and check for ID").  She was laid off from her security guard positions in 2020 as a result of the COVID-19 pandemic.  *See id.* at 41:18-21.  Since 2020, Plaintiff claims to have searched for employment on online job databases and to have applied to one position in 2021 and three positions in 2022, all in private security.  *See id.* at 41:2-8, 42:19-43:14; Hearing Ex. 6.  Plaintiff explained that she has not applied to law enforcement positions for two reasons: first, because she observed on two police departments' websites that she exceeded the maximum age for applying, Hearing Tr. at 44:3-47:15; and second, because she believed that she would not be hired for a law enforcement job given her disciplinary record from the NYPD, *id.* at 45:11-16, 47:19-48:18.  Finally, she affirmed that, had she not been constructively discharged, she would have worked at the NYPD until she reached the mandatory retirement age of 63.  *Id.* at 54:5-8.

Exercising its discretion, the Court finds that Defendants have not met their burden of establishing that Plaintiff failed to mitigate her damages entirely, and that Plaintiff is thus entitled to a front pay award—albeit only for the next five years, as opposed to through her retirement age.

"Generally, an employer seeking to avoid a lost wages award bears the burden of demonstrating that a plaintiff has failed to satisfy the duty to mitigate." *Broadnax v. City of New Haven*, 415 F.3d 265, 268 (2d Cir. 2005). "This may be done by establishing (1) that suitable work existed, and (2) that the employee did not make reasonable efforts to obtain it." *Dailey v. Societe Generale*, 108 F.3d 451, 456 (2d Cir. 1997). In *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47 (2d Cir. 1998), the Second Circuit established an exception to this rule under which an employer "is released from the duty to establish the availability of comparable employment if it can prove that the employee made no reasonable efforts to seek such employment." *Id.* at 54. Applying this principle, the court held that a plaintiff had failed to exercise reasonable diligence in finding other suitable employment, and was therefore not entitled to front pay, when he spent only six months at a temp agency following his termination and there was "no evidence that [those six months] followed upon a diligent search for more permanent employment." *Id.* That said, a defendant's burden in proving failure to mitigate "is not satisfied merely by a showing that there were further actions that [a] plaintiff could have taken in pursuit of employment. Rather, [the] defendant must show that the course of conduct [the] plaintiff actually followed was so deficient as to constitute an unreasonable failure to seek employment . . . and the . . . plaintiff must be given the benefit of every doubt in assessing her conduct." *E.E.O.C. v. Kallir*, 420 F. Supp. 919, 925 (S.D.N.Y. 1976). The question of reasonableness requires "consideration of such factors as the individual characteristics of the claimant and the job market, as well as the quantity and quality of

the particular measures undertaken by the plaintiff to obtain alternate work." *Dailey*, 108 F.3d at 456.

The Court credits Plaintiff's testimony that she was laid off from her past jobs due to the pandemic, has applied for other security jobs without success, and genuinely believed that she was too old to apply for positions in other police departments based on her review of those departments' websites.[7]  Indeed, Defendants did not meaningfully rebut this evidence.  Nor did they "show[] that comparable positions were available for" Plaintiff in any relevant fields notwithstanding her age.  *Padilla*, 92 F.3d at 125; *cf. Ramey v. Dist. 141, Int'l Assoc. of Machinists & Aerospace Workers*, No. 99-CV-4341 (BMC) (RML), 2010 WL 3619708, at *6 (E.D.N.Y. Sept. 10, 2010) (explaining that defendants could have rebutted plaintiffs' testimony on mitigation by "offer[ing] job postings from other airlines, if there were any, seeking to hire airline mechanics who were two or three years from retirement").  Although Defendants questioned Plaintiff about her failure to seek employment outside law enforcement or security, the Second Circuit has made clear that a plaintiff "need not go into another line of work" to satisfy her mitigation duty.  *Dailey*, 108 F.3d at 456.[8]  Keeping in mind the high burden in showing lack of mitigation, the Court concludes

---

[7] Also relevant to the Court's consideration is that Plaintiff's job search efforts may well have been stymied by the ongoing pandemic, its effects on the job market, and this litigation.

[8] There is some uncertainty at the margins of the mitigation doctrine both as to (1) at what point an employee may permissibly decline a new job for being too dissimilar to a prior job and (2) at what point an employee fails to satisfy her duty to mitigate by accepting a job that is too dissimilar from her prior job and failing to search for more similar jobs.  *Compare Greenway*, 143 F.3d at 53 ("A discharged employee must use reasonable diligence in finding other suitable employment, which need not be comparable to their previous positions.") (citing *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231-32 & n.15 (1982)), *with Wills-Hingos v. Raymond Corp.*, 104 F. App'x 773, 775-76 (2d Cir. 2004) (stating that a "plaintiff must demonstrate reasonable diligence in seeking suitable employment," explaining that "[s]uitable employment means a job that is substantially equivalent to plaintiff's former job," citing *Ford Motor Co.*, 458 U.S. at 232, and approvingly discussing jury instructions that stated that the "jury could consider . . . whether the jobs [plaintiff] sought were substantially equivalent to the one that was lost"); *see also Arbercheski v. Oracle Corp.*, 650 F. Supp. 2d 309, 313-14 (S.D.N.Y. 2009) ("Oracle has demonstrated that once [its former employee] accepted the waitress position, she ceased all efforts to obtain other employment comparable to her previous job . . . Oracle is entitled to summary judgment on any claim for back or front pay dating from May 2004, based on [the plaintiff's] failure to undertake *any* reasonable efforts since accepting the waitress position to secure comparable employment.").  Given the facts of this case, the Court need not resolve any such uncertainty as to the scope or boundaries of the duty to mitigate.

that Defendants have not shown that Plaintiff made no reasonable efforts to obtain alternative employment.  *See, e.g.*, *Evans v. State of Conn.*, 967 F. Supp. 673, 681-82 (D. Conn. 1997), *aff'd sub nom. Evans v. Connecticut*, 24 F. App'x 35 (2d Cir. 2001) (finding that the state had not shown that a former police officer failed to mitigate his damages when he applied to other departments without success and "worked as a limousine driver" and "as a security officer for various hotels").

That said, Defendants' "failure to show that [Plaintiff] had not mitigated damages does not entitle [her] to a lifetime front-pay award."  *Dominic v. Consol. Edison Co. of New York*, 822 F.2d 1249, 1258 (2d Cir. 1987).  Rather, "[i]n calculating the size of a front-pay award the court must estimate the plaintiff's ability to mitigate damages in the future."  *Id.*  On the evidence presented to the Court, it cannot, without undue speculation, find that Plaintiff has no reasonable prospects of mitigating her damages in the future by obtaining comparable employment.

Although Plaintiff has not obtained full-time comparable employment since leaving the NYPD, her efforts to do so fall well short of a robust job search.  Her W2s indicate that she worked at her prior positions only on a temporary and/or part-time basis; for example, in 2019, she made $17,181 in wages from her security job, which, at $25 per hour, corresponds to just 687 hours, or 17 weeks of full-time work assuming a 40-hour workweek.  *See* Hearing Ex. 4 at 27.  Turning to Plaintiff's more recent efforts, the only evidence of her seeking employment after being laid off in 2020 are three applications she submitted in or around May 2022—and two of those applications were submitted only days after this Court stated it would hold an evidentiary hearing on front pay.  *See* Hearing Ex. 6.  Finally, Plaintiff has not applied to a single law-enforcement position.  Although the Court does not question the veracity of her belief that she was age-barred from doing so, her testimony about viewing two departments' websites is entitled to limited weight, given that she did not produce evidence of those departments' policies, including whether those policies

apply with equal force to former officers in other departments.  *Cf. Rasic v. City of Northlake*, No. 08-CV-0104 (SIS), 2010 WL 3365918, at \*16 (N.D. Ill. Aug. 24, 2010) (discussing a state-law exception to the maximum-age requirement for police officers for those who were previously employed as police officers in other municipalities).  Nor is Plaintiff's concern that she is precluded from law enforcement jobs because of her disciplinary record reasonable in light of the jury verdict that such discipline was the result of unlawful retaliation.  *See Hunter v. Town of Mocksville*, 897 F.3d 538, 563 (4th Cir. 2018) (approving of the district court's finding that "the jury verdict in [a plaintiff's] favor removed any cloud over his reputation as a result of his termination and this litigation").  Plaintiff's minimal efforts to find employment thus support a temporary, rather than permanent, front pay award.  *See, e.g.*, *Fernandez v. N. Shore Orthopedic Surgery & Sports Med., P.C.*, 79 F. Supp. 2d 197, 204-05 (E.D.N.Y. 2000) (finding that "two years is a reasonable allotment of time in which [plaintiff, a 60-year-old X-Ray technician,] could be expected to find employment comparable to that which he lost" after concluding that applying to only eight hospitals over four years constituted "minimal" efforts to secure employment).

Moreover, the evidence regarding Plaintiff's experience and qualifications distinguishes this case from those in which courts found no reasonable prospects of obtaining comparable employment.  Unlike the plaintiffs in *Padilla* and *Broadnax*, Plaintiff has a bachelor's degree, Hearing Tr. at 56:3-6, significantly increasing the number of jobs for which she is qualified.  *Cf.* 92 F.3d at 126; 141 F. App'x at 22-23.  And while her skills are specialized, they are not as "narrowly focused" as those of the plaintiff in *Padilla*, who was a railroad dispatcher supervisor, 92 F.3d at 126, or of the plaintiff in *Broadnax*, whose experience was limited to "specialized firefighting and emergency rescue," 141 F. App'x at 23.  Rather, Plaintiff has skills in the broader fields of law enforcement, security, crisis intervention, and criminal investigations, Hearing Tr. at

43:3-8, 56:9-13, 60:10-14, all of which have applications outside the officer roles she has occupied. Keeping in mind that "[c]omparable employment need not be identical employment, either in job duties or remuneration," *Hill v. Airborne Freight Corp.*, No. 97-CV-7098 (FB), 2003 WL 366641, at *5 (E.D.N.Y. Feb. 20, 2003), there is a reasonable possibility that Plaintiff will "be able to find work commensurate with [her] skills at a salary equal to what [she] received" at the NYPD before she reaches retirement age, *cf. Padilla*, 92 F.3d at 126.  At the very least, assuming otherwise would be speculative on this limited record.  Accordingly, the Court exercises its discretion to conclude that an award of front pay for five years is appropriate.

In calculating front pay, the Court adopts Plaintiff's requested salary of $158,780.67—her salary from 2016, the last full year she worked at the 9th Precinct—but deducts from that figure the $10,212.58 withheld in state income taxes in order to avoid a windfall, given that Plaintiff's pension is state-tax free.  *See* Pl. MOL at 7; Hearing Ex. 2 at 5.[9]  This results in an annual salary of $148,568.09.  Subtracting Plaintiff's annual expected pension of $100,256.16 leads to an annual front pay award of $48,311.93.  *See* Hearing Tr. at 41:19-42:9 (Plaintiff explaining that she expected to receive $88,256.16 in pension payments plus $12,000 in variable supplements every year for the rest of her life).  The Court orders that this award be paid in biannual installments, and that the award be offset by any earnings Plaintiff receives in addition to her pension if she obtains alternative employment before the end of her front pay period.  *Cf. Clarke v. Frank*, 960 F.2d 1146, 1152 (2d Cir. 1992) ("[I]f [a plaintiff] accepts less prestigious work, his earnings from that job are subtracted from his back pay award."); *Fox v. City Univ. of New York*, No. 94-CV-4398 (CSH), 1999 WL 33875, at *15 (S.D.N.Y. Jan. 26, 1999) ("Plaintiff is required, of course, to subtract [her]

---

[9] Because the Court's front pay award does not factor in future salary increases, it need not discount the award to present value.  *See Stratton v. Dep't for the Aging for City of New York*, 132 F.3d 869, 882 (2d Cir. 1997) ("The district court did not factor future salary increases into its front pay award; hence, it was not required to discount to present value.").

substitute earnings and benefits from the gross front pay claim.").  If Plaintiff receives no income

other than her pension for the next five years, this will add up to a total front pay award of

$241,559.65.

## III.    Plaintiff's Motion for Attorneys' Fees

Finally, the parties dispute the amount of attorneys' fees to which Plaintiff is entitled.[10]

Plaintiff seeks hourly rates of $650 for Emeka Nwokoro and John Scola[11] and an hourly rate of

$450 for Jack Jaskaran.  These hourly rates, multiplied by the 731 hours that counsel billed, results

in a total requested award of $410,660.00.  Defendants argue that those rates should be reduced to

$300 for Mr. Nwokoro and Mr. Scola; that the number of hours billed should be reduced by 60%;

and that Mr. Jaskaran not be awarded any fees because all his hours are duplicative or unnecessary.

Alternatively, Defendants seek a total award of $58,000, which represents one-third of the jury's

back pay award.  For the reasons that follow, the Court awards Mr. Nwokoro an hourly rate of

$400, Mr. Scola an hourly rate of $350, and Mr. Jaskaran an hourly rate of $250; it also reduces

the number of hours billed by 25%.

### A.    Legal Standards

When exercising their discretion to determine the reasonableness of the attorneys' fees

sought, courts in this Circuit use the "presumptively reasonable fee" standard.  *Arbor Hill*

*Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 190 (2d Cir. 2008).

The presumptively reasonable fee, also known as the lodestar, is "the product of a reasonable

---

[10] Title VII and the NYCHRL provide for an award of reasonable attorneys' fees to a prevailing plaintiff, *see* 42 U.S.C. § 2000e-5(k); N.Y.C. Admin. Code § 8-502(g), and the NYSHRL allows a prevailing party attorneys' fees in cases involving employment discrimination, *see* N.Y. Exec. L. § 297(10) ("In cases of employment discrimination, a respondent shall only be liable for attorney's fees under this subdivision if the respondent has been found liable for having committed an unlawful discriminatory practice.").

[11] In a discrepancy that Defendants highlight, Mr. Scola states in his declaration that he seeks an hourly rate of $600, not the $650 that is requested in Plaintiff's memoranda of law.  *See* First Scola Dec. ¶ 24.  Because the Court awards an hourly rate that is lower than either of these figures, it need not resolve this discrepancy.

hourly rate and the reasonable number of hours required by the case." *Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011).  A reasonable hourly rate is "the rate prevailing in the relevant community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Farbotko v. Clinton County of N.Y.*, 433 F.3d 204, 208 (2d Cir. 2005).

In determining an appropriate hourly rate, courts consider the factors discussed in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974):

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Lilly v. City of New York*, 934 F.3d 222, 228 (2d Cir. 2019).  Because "the determination of fees should not result in a second major litigation," *Fox v. Vice*, 563 U.S. 826, 838 (2011), courts may consider the *Johnson* factors holistically, rather than applying each factor individually to the facts of the case. *See, e.g.*, *Green v. City of New York*, No. 05-CV-0429 (SLT) (ETB), 2010 WL 148128, at *10 (E.D.N.Y. Jan. 14, 2010).

"[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).  Thus, "[r]equested fees must be supported with contemporaneous time records establishing for each attorney for whom fees are sought, the date on which work was performed, the hours expended, and the nature of the work done." *Abdell v. City of New York*, No. 05-CV-8453 (RJS), 2015 WL 898974, at *2 (S.D.N.Y. Mar. 2, 2015).  In this context, a "reasonable fee is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case." *Restivo v. Hessemann*, 846 F.3d 547, 589 (2d Cir. 2017).

### B.   Discussion

#### 1.   Hourly Rates

In support of her fees motion, Plaintiff submitted a corroborating declaration from another New York City civil rights attorney attesting to the reasonableness of Plaintiff's requested hourly rates, *see* Maduegbuna Dec., which courts have treated as relevant evidence that may support a particular rate, *see, e.g.*, *Balu v. City of New York*, No. 12-CV-1071 (KPF), 2016 WL 884666, at *3 (S.D.N.Y. Mar. 8, 2016).  She neglected, however, to cite any cases that awarded equivalent rates in similar cases.

Notwithstanding this omission, courts in this District have awarded experienced civil rights attorneys, including those practicing alone or in small firms, hourly rates ranging from $200 to $650 per hour.  *See, e.g.*, *Angulo v. 36th St. Hosp. LLC*, No. 19-CV-5075 (GBD) (SLC), 2020 WL 4938188, at *17 (S.D.N.Y. July 31, 2020), *adopted by* 2020 WL 4936961 ("[C]ourts in this District awarding attorneys' fees in employment discrimination cases have found that the range of fees in this District for seasoned civil rights litigators, particularly those in small firms, is between $200/hr and $300/hr."); *Wright v. City of New York*, 283 F. Supp. 3d 98, 104 (S.D.N.Y. 2017) (finding that the prevailing rate for civil rights attorneys with nine years' experience as solo practitioners or member of small firms was between $250 and $350 an hour); *Gurung v. Malhotra*, 851 F. Supp. 2d 583, 597 (S.D.N.Y. 2012) ("Courts in this District have determined in recent cases that the range of appropriate fees for experienced civil rights and employment law litigators is between $250 and $450."); *Salama v. City of New York*, No. 13-CV-9006 (PKC), 2015 WL 4111873, at *2 (S.D.N.Y. July 8, 2015) ("Rates found reasonable by courts in this District for experienced civil rights attorneys appear to cluster in the $350-450 per hour range."); *Dancy v. McGinley*, 141 F. Supp. 3d 231, 238 (S.D.N.Y. Sept. 21, 2015) (awarding a civil rights litigator with sixteen years

of experience a $400 hourly rate); *Coakley v. Webb*, No. 14-CV-8438 (ER), 2016 WL 1047079, at *5 & n.6 ("[P]recedent in this District clearly demonstrates that experienced solo civil rights practitioners and civil rights attorneys from small law firms have been awarded hourly rates as high as $550 to $650."); *Greenburger v. Roundtree*, No. 17-CV-03295 (PGG) (SLC), 2020 WL 6561598, at *13 (S.D.N.Y. Jan. 16, 2020), *adopted by* 2020 WL 4746460 (awarding a $600 hourly rate to counsel with 40 years of experience as a civil rights practitioner, including in high-profile cases); *Abdell*, 2015 WL 898974, at *3 (awarding a $650 hourly rate to an experienced civil rights solo practitioner).

In support of their request for a $650 hourly rate for Mr. Nwokoro and Mr. Scola, counsel cite their years of experience—twenty-four years for Mr. Nwokoro and eleven years for Mr. Scola—as well as both attorneys' previous success in other high-profile civil rights cases. *See* Nwokoro Dec. ¶¶ 9, 11-12; First Scola Dec. ¶¶ 7, 9-16. They also affirm that many recent clients have signed retainer agreements providing that if counsel's "legal services are terminated in a matter prior to dispositive resolution, [their] time is to be billed at $650 per hour." Nwokoro Dec. ¶ 14; First Scola Dec. ¶ 21.[12] Finally, the Court takes note of the fact that that the fee arrangement in this case was contingent, thus exposing counsel to the risk of receiving no fees at all. *See, e.g.*, *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 53 (2d Cir. 2000) ("[C]ontingency risk . . . must be considered in setting a reasonable fee.").

The Court must, however, balance this favorable evidence with the factors that counsel for a lower hourly rate. First and foremost, this case did not involve particularly "novel[]" or "difficult[]" questions, a factor that also goes to the time, labor, and skill that was required of

---

[12] Plaintiff also relies on a fee chart that is apparently used in the D.C. Circuit to calculate attorneys' fees in complex civil litigation.

counsel.  *See Lilly*, 934 F.3d at 228.  Second, the combination of the pre-trial dismissal of Plaintiff's

discrimination and hostile work environment claims, Greany's post-trial dismissal from the case,

Plaintiff's failure to collect any emotional distress damages, and the significant reduction in the

front pay award indicates that Plaintiff achieved less than "excellent results."  *Hensley*, 461 U.S.

at 435; *see also Barfield v. New York City Health & Hospitals Corp.*, 537 F.3d 132, 152 (2d Cir.

2008) (considering the "degree of success obtained" as a "critical" *Johnson* factor).  Third,

notwithstanding counsel's charged rates in other cases, the retainer agreement executed by Plaintiff

here provided that, if she discharged counsel without just cause before a settlement was made, she

would pay them $300 an hour on a quantum meruit basis—less than half the hourly rate counsel

now requests.  *See* Nwokoro Dec. Ex. 1.  Although "a court is not bound by the parties' retainer

agreement, it may still use such agreement as guidance in determining the reasonable value of the

services provided."  *Stair v. Calhoun*, 722 F. Supp. 2d 258, 268-69 (E.D.N.Y. 2010).

Holistically balancing these factors and the remaining *Johnson* factors while keeping in

mind the historical prevailing rates in this District for experienced civil rights attorneys, the Court

finds that an hourly rate of $400 for Mr. Nwokoro and $350 for Mr. Scola is appropriate.  Although

these rates fall short of the highest fees recently awarded to experienced civil rights practitioners,

such deduction is warranted given the relative lack of complexity of Plaintiff's case, the limited

nature of the relief she obtained, and the evidence that Plaintiff herself agreed to pay counsel $300

per hour.

The Court turns next to Mr. Jaskaran's hourly rate.  Although Mr. Jaskaran details his

experience and accomplishments from his prior employment with the NYPD, it is only his legal

experience that is relevant.  On that front, the Court notes that Mr. Jaskaran received his J.D. in

2018 and was admitted to the bar in 2019—making him equivalent to a junior associate.  *See*

Jaskaran Dec. ¶¶ 12-13. Such limited experience does not warrant the $400 hourly rate he requests. *See, e.g.*, *Angulo*, 2020 WL 4938188, at *17 ("For an associate with two to four years' experience . . . other courts in this District have found a reasonable hourly rate to be $250 to $275."); *Munson v. Diamond*, No. 15-CV-0425 (DAB) (BCM), 2017 WL 4863096, at *11 (S.D.N.Y. June 1, 2017) (awarding $250 hourly rate to associate with three years of experience); *Galeana v. Lemongrass on Broadway Corp.*, 120 F. Supp. 3d 306, 324 (S.D.N.Y. 2014) (awarding $250 hourly rate to junior associate with employment litigation focus); *Gurung*, 851 F. Supp. 2d at 597 (awarding hourly rate of $275 to third-year associates). Rather, the Court finds that an hourly rate of $250 more appropriately reflects Mr. Jaskaran's limited experience.

In sum, the Court finds that hourly rates of $400 for Mr. Nwokoro, $350 for Mr. Scola, and $250 for Mr. Jaskaran are appropriate. Counsel's travel time shall be billed at half that rate, or $200 per hour for Mr. Nwokoro, $175 for Mr. Scola, and $125 for Mr. Jaskaran. *See Tlacoapa v. Carregal*, 386 F. Supp. 2d 362, 373 (S.D.N.Y. 2005) ("Courts in this Circuit regularly reduce attorney's fees by 50% for travel time because time spent by attorneys in transit may be beneficial, but it probably is not as productive as time at the office or in court.").

## 2. Number of Hours Billed

Having determined counsel's reasonable hourly rates, the Court next turns to the appropriateness of the 731.6 hours that counsel billed in this matter. When considering the reasonableness of hours billed, courts should exclude hours that are "excessive, redundant, or otherwise unnecessary." *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983). In reducing such hours, courts have broad discretion to either eliminate specific time entries or "use a percentage deduction as a practical means of trimming fat from a fee application." *McDonald ex rel. Prendergast v. Pension Plan of the NYSA-ILA Pension Tr. Fund*, 450 F.3d 91, 96 (2d Cir. 2006) (per curiam).

Defendants object to at least twenty specific billing entries as excessive, duplicative, or erroneous, devoting their most vehement objections to counsel's billed travel time. *See, e.g.*, Defs' Reply MOL at 21 ("On February 2, 2018, Mr. Nwokoro bills for 2.5 hours of travel time to and from SDNY.  Mr. Nwokoro bills 2.5 hours of travel times numerous times each time he travels to Court!  Counsel's office is located at 44 Wall St.  This is less than 1 mile away!").  In addition to these specific challenges, Defendants attack Plaintiff's billing entries on the whole for being impermissibly vague.  Finally, Defendants argue that Mr. Jaskaran should be entitled to bill no hours because he billed only for time spent attending trial, at which he did not examine any witnesses, or for tasks that Defendants characterize as duplicative.

Although Plaintiff offers no response to Defendants' objections to specific time entries, the Court independently concludes that most of these objections are unpersuasive.[13]  The Court also declines to entirely eliminate the hours Mr. Jaskaran billed for attending trial simply because he did not present to the jury or question witnesses; although it is true that "courts in this district have generally frowned upon awarding fees to more than two attorneys for court appearances unless the case is uniquely complex," *Ng v. King Henry Realty, Inc.*, No. 16-CV-0013 (PAE) (JCF), 2016 WL 6084074, at *6 (S.D.N.Y. Oct. 7, 2016), a trial is more significant than a routine conference

---

[13] First, the fact that counsel was representing Velazquez and another witness, Valentin Khazan, in separate matters does not mean that it was unreasonable to devote time to meeting those individuals in connection with this action, particularly when they both testified at trial.  *See* Defs.' Opp. MOL at 20, 21; Nwokoro Dec. Ex. 2 at 3, 51.  Second, it was reasonable for counsel to bill time for filing Plaintiff's EEO complaint, as doing so is a prerequisite to filing suit in federal court on a Title VII claim.  *See* Defs.' Opp. MOL at 20; Nwokoro Dec. Ex. 2 at 4-5.  Third, it was reasonable to meet with Plaintiff twice for an "in-depth review of [her] civil rights complaint," as the first such meeting was for her EEOC complaint and the second such meeting was for her federal court complaint.  *See* Defs.' Opp. MOL; Nwokoro Dec. Ex. 2 at 5, 10.  Fourth, the Court disagrees that it was unreasonable for counsel to spend approximately an hour "speaking to process servers" and reviewing affidavits of service for compliance with procedural rules.  *See* Defs' Opp. MOL at 20; Nwokoro Dec. Ex. 2 at 13, 15.  Fifth, the Court can reasonably infer that work performed by "C.N." refers to work performed by Mr. Nwokoro—whose full name appears on the docket as Chukwuemeka Nwokoro—and that the entries for "jury selection" from July 26 through August 4 are intended to describe counsel's appearance at trial.  *See* Defs' Opp. MOL at 21; Nwokoro Dec. Ex. 2 at 22, 43, 45, 47, 119-33, 140-48.  Finally, the Court does not find counsel's combined travel time—44.5 hours, shared among three attorneys, on a case that lasted four years and that concluded with an eight-day trial—to be excessive, although it agrees that such time should be billed at half the relevant hourly rates.

or even a deposition, and courts generally only reject the presence of four or more attorneys at trial. *See, e.g.*, *Robinson v. City of New York*, No. 05-CV-9545 (GEL), 2009 WL 3109846, at *8 (S.D.N.Y. Sept. 29, 2009) ("[F]our attorneys [at trial] is one too many.").   Moreover, Mr. Jaskaran's other billing entries are not duplicative with the similar tasks billed by other lawyers, because his experience as a former police officer suggests that he may have had an especially useful perspective on the evidence in this case that Mr. Nwokoro and Mr. Scola may not have had. The Court will, however, reduce Mr. Jaskaran's billed trial time by 50% in recognition of his passive role during that proceeding and minimal role in this case overall. *See id.* (reducing by fifty percent certain fees billed by an attorney whose "role at trial was largely passive" and whose overall role "in the case was minimal").

Moving beyond Defendants' specific objections, the Court finds that a general reduction in the number of hours counsel billed is warranted.  As an initial matter, several billing entries are excessive, duplicative, or impermissibly vague.[14]   Compounding the vagueness problem is counsel's occasional engagement in block billing.  "Although block billing is not preferred, it is permissible so long as the records allow the court to conduct a meaningful review of the hours requested."  *Restivo*, 846 F.3d at 591.  But when the practice "meaningfully clouds a reviewer's ability to determine the project on which significant legal hours were spent," a reduction may be warranted.  *Beastie Boys v. Monster Energy Co.*, 112 F. Supp. 3d 31, 53 (S.D.N.Y. 2015).  Block billing is "most problematic where large amounts of time (*e.g.*, five hours or more) are block billed."  *Id.*

---

[14] First, counsel should not bill for the time spent analyzing and correcting the technical deficiencies in Plaintiff's initial complaint that caused it to be rejected by the Clerk of Court.  *See* Nwokoro Dec. Ex. 2 at 12.  Second, Mr. Jaskaran appeared to bill 4.5 hours on December 23, 2019, but this entry is not accompanied by a descriptive entry justifying those hours.  *See id.* at 72.   Finally, several of the entries regarding the review of documents and transcripts appear at least somewhat duplicative, given the lack of descriptive information provided in those entries.  *See, e.g.*, *id.* at 32-33, 44-46, 71-73, 96-97, 102-03.

Here, some of the most problematically vague entries include: (1) four hours billed on "preparation for trial: further review of entire file and revision of notes and questions for the examination of trial witnesses"; (2) four hours billed the next day with the exact same description; (3) four and a half hours billed on "preparation for trial: revision of draft notes and questions for the examination of witnesses"; (4) four and a half hours billed on "preparation of exhibits for trial"; (5) seven hours billed on "preparation for trial: review, revision, and further preparation of draft notes and questions for the examination of 8 witnesses"; (6) five and a half hours billed on "preparation for trial: preparation of notes and questions for use in the examination of NYPD witnesses"; (7) five and a half hours billed the next day with the same description; (8) five and a half hours billed the next day with the same description; and (9) five and a half hours billed the next day with the same description. *See* Nwokoro Dec. Ex. 2 at 104-06, 110, 113-17.  Given how generic these descriptions are, the Court cannot discern how much time was spent on particular pretrial tasks, and therefore cannot determine the independent reasonableness of the hours billed. *See Raja v. Burns*, No. 21-CV-0945, 2022 WL 3022527, at *6 (2d Cir. Aug. 1, 2022) (discussing the role of determining "independent unreasonableness" in block-billed entries).[15]  Finally, in the Court's view, counsel's lack of preparation throughout this entire litigation—particularly during trial—at times resulted in them requiring an excessive number of hours to argue and present their case.  *See, e.g.*, *Legends Are Forever, Inc. v. Nike, Inc.*, No. 12-CV-1495 (LEK) (DEP), 2013 WL 6086461, at *5 (N.D.N.Y. Nov. 18, 2013) (considering the fact that "discovery in this case has proceeded at an unacceptably slow pace" when considering "the number of hours reasonably expended"); *see also generally Nnebe v. Daus*, No. 06-CV-4991, 2022 WL 612967, at *7-8

---

[15] Unlike the billing records in *Raja*, the nature of counsel's block billing here makes it "difficult . . . to parse the block-billed entries individually to determine to what extent the time was reasonably billed." *Cf.* 2022 WL 3022527, at *6.  That is, the Court cannot "identify discrete tasks within the block-billed hours" such that it can determine the reasonableness of the time spent on those tasks. *Id.*

(S.D.N.Y. Mar. 1, 2022) (applying a 15% reduction in billed hours "to account for (1) unsuccessful litigation efforts, (2) unreliability in some of the records, and (3) block billing or vague entries" in "the various attorneys' time records," even though most of the "vague entries . . . still contain[ed] enough specificity to determine whether the time expended on the activity [was] reasonable").

Given all of these concerns with counsel's billing practices, the Court finds that a twenty percent reduction in the number of hours billed is appropriate and supported by this District's precedents. *See, e.g.*, *Beastie Boys*, 112 F. Supp. 3d at 57 ("Fee reductions around 30% are . . . common in this District to reflect considerations of whether work performed was necessary, leanly staffed, or properly billed."); *Hines*, 613 F. App'x at 54-55 (affirming a 30% reduction in fees based on block billing and other concerns); *De La Paz v. Rubin & Rothman, LLC*, No. 11-CV-9625 (ER), 2013 WL 6184425, at *6 (S.D.N.Y. Nov. 25, 2013) (approving the reduction of hours by 30% in light of vague and excessive entries).

## CONCLUSION

For the foregoing reasons, Defendants' motion for judgment as a matter of law is granted; Defendants' motion for remittitur is granted in part; and Plaintiff's motion for attorneys' fees is granted with modifications.  The Clerk of Court is respectfully directed to terminate the motions at docket numbers 129 and 137.

Within two weeks from the date of this order, Plaintiff shall submit a letter indicating whether she accepts the Court's remittitur of her front pay award or whether she instead seeks a new trial. *See Lee v. Edwards*, 101 F.3d 805, 808 (2d Cir. 1996) ("If a district court finds that a verdict is excessive, it may order a new trial, a new trial limited to damages, or, under the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages

in a reduced amount.").  If Plaintiff elects to accept the Court's front pay award, she shall submit

a proposed judgment.  That proposed judgment shall include:

- an award of back pay in the amount of $174,578.52 plus prejudgment interest;
- an award of five years of front pay, totaling $241,559.65, to be disbursed by the City in biannual installments and to be offset by any additional income Plaintiff receives in addition to her pension, and
- an attorneys' fees award consistent with the Court's ruling on counsel's reasonable hourly rates, including the reduced travel time rates, and reflecting a twenty percent reduction in the total number of billed hours.

The City shall submit any objections to the proposed judgment within one week of its filing.

SO ORDERED.

Dated:      August 9, 2022
                New York, New York

_____
Ronnie Abrams
United States District Judge